*47Opinion of the Court, by
Judge Owsley.
íyALTER Brashears, being indebted by contract to the intestate, William Lapsley, one thousand dollars, the láffc&r brought suit in the Fayette circuit court, and-recovered judgment against the former for the amount of his debt, together with interest thereon from the first dayhf March 1815, until paid, and costs.1
Upon this-judgment the intestate^ William Lapsley, caused a capias ad satisfaciendum to issue,.directed to the sheriff of Fayette county, and the sheriffhavin'g arrested the said Brashears and delivered him into the custody of the jailer of Fayette county, the said Brashears’ was permitted the liberty of the prison rules, upon his entering into bond with Robert R. Barr his security, conditioned as required by law.
Brashecjis escaped from the rules of the prison, and suit was brought by William Lapsley, upon tlje bond given for keeping the rules, and in January 1816, judgment was thereon finally recovered against Brashears and his security, Barr, for one thousand one hundred and twenty-one dollars and eighty cents, besides costs.
After this, William Lapsley departed this life, and administration of his estate was granted to David Laps-ley, who thereafter brought a scire facias in the general court, where the judgment in the action upon the bond given for the prison rules had been rendered, and at the January term 1817, recovered judgment to have execution in his nape, as administrator, &c. for the amount of the judgment which had been recovered by the intestate, William Lapslev, and costs.
Accordingly, there issued from the clerk’s office of the general court, on the 23d of April, 1317, a fieri far cids upon the judgment in favor of the administrator, David Lapsley, against the estate of Walter Brashears and Robert R. Barr, directed to the sheriff of Fayette county; and on the 16th of June, 1817, Brashears a’nd Barr, together with E. Warfield their security, execut-
*48ed a replevin bond,^conditioned to pay the amount of the execution, interest and costs, to the said David LapSjey5 w¡thip twelve moiiths from the date'thereof, and. the sheriff returned upon the ft-fa. “ executed and replevied’twelve months,” and lodged the same, together vyjt^ the replevin bond, with the clerk of the general , r 1 ° court.
After the expiration of the twelve months, and on the _ 15th. of August, there is.suedupon the replevin bond a wr^ facias, against the estate of Brashears, Barr and Warfield, directed to the sergeant of the court of appeals, upon which the sergeant returned, “ staged bv injunction the 28th September, 1818.”
The injunction was thereafter dissolved, and another writ of fieri facias issued on the 12th of October, Í82‘l, upon the replevin bond, directed to the sheriff of Fay-ette county, and on the 23d of October, 1822, Bra-shears, Barr and Warfield, together with Thomas T. Barr, their security, executed another replevin bond, 'conditioned to pay the amount of the execution, interest and costs, to David Lapsley, within two years from the date thereof ; and the she riff returned, “ levied and replevied,” and lodged with the clerk the fi. fa. and replevin bond.
At tlje January term of the general court,'’l 822, David Lapsley, by his counsel, moved the court to quash this latter replevin bond, and the return of the sheriff upon the latter execution; but his motion was overruled, and by hill of exceptions, the facts proved on the motion, were made part of the record.
From the decision of the court overruling his motion to quash, each parly has appealed (o this court.
Before we enter on the examination of the questions involved in the decision of the court below, it may not be improper to advert to some of the provisions contained in the act of the legislature of this country, which passed at the session of 1820, prior to the date of the execution which was replevied for two years.
The first section of that act provides, that “ when any execution shall issue from the clerk of any court, or any justice of the peace, on any judgment or decree in favor of any person or persons, or corporation, heretofore or hereafter obtained, it shall be lawful for the plain,tiffor plaintiffs, by themselves, their agent or attorney, to endorse on said execution as follows, viz. “that either *49notes on the Bank of Kentucky or its branches, or notes on the Bank of the Commonwealth of Kentucky or its branches, may be received by the officer in discharge of the whole' of this execution.” And in case such endorsement is made, said execution shall be collected or replevied agreeable to the laws in force, allowing three months’replevin, without any further stay or replevin, as heretofore allowed by this act.” ' i
The second section provides, that “ when any execution may issue as, aforesaid, without an endorsement showing the conseht'of the plaintiff or plaintiffs* to take such,bank notes as described in the first section of this act, and the said execution shall be levied.on the estate or person of any such defendant or defendants, he, she or they may give bond with approved security to the officer executing the same, to pay the amount of debt, interest and costs of any such execution, to the plaintiff or plaintiffs, in two years; and the officers of justice shall be regulated in the taking the said bond and renewing execution thereon', as they are now directed by law, in case of replevin bonds for three months.”
The ninth section provides, that “ in all cases where an execution may or shall issue or be issued, upon any replevin bond, recognizance, forthcoming bond, or other bond' having the force of a judgment, except upon bonds given for the purchase of property sold under execution or order of sale, unless the plaintiff or plaintiffs shall, in addition to the endorsement that notes on the Batik of Kentucky and its branches will be taken in discharge of said execution, endorse that notes on the Bank of the Commonwealth of Kentucky and its branches, will be received in like manner, the defendant or defendants in such execution or executions, may replevy the same for twelve months.”
It was under this act, of which the sections cited compose a part, the two years’ replevin bond was taken by the sheriff. It is obvious, however, that in taking that bond, the sheriff ha.s not acted in strict conformity to his duty, as prescribed in the act. The execution under which the sheriff acted in taking the bond, issued upon a replevin bond which had been previously given by Brashears, Barr and Warfield, and the. ninth section of the act, in terms not to be misunderstood, limjls the time of replevin in such a case to pne. and not#$f*iwo *50years. When the execution issues On ajudgme rd or de~ cree, and is not endorsed, the secori'd section of the act allows the defendant the liberty of replevying two years, and we know that other acts have declared, that replevin bonds shall have the force of judgments. But, wé apprehend, it was not intended by the legislature to extend the liberty of replevying two- years to defendants who may have previously replevied the same demand; or, in other words, it was not intended to give the defendant to an execution, which' issues upon a re-plevin 6ond, the liberty of a further replevin of two years, though the replevin bond upon which the execution issues-, may possess' the force of a judgment. It, in fact, cannot have been so intended by the makers of the law, or why, in the ninth section, limit the replevin to one year, when the execution issues upon a replevin bond?
Were the act of the sheriff, therefore, tested exclusively by the provisions of the act cited, neither his return upon the execution nor the replevin bond, could be Sustained.
But the motion of the plaintiff was not predicated upon any departure from the requisitions of the act by the sheriff. The difference between one year mentioned in the act and two years expressed in the condition of the replevin bond, was passed over by the plaintiff, and the Validity of the bond and sheriff’s return, were assailed upon more comprehensive grounds. The motion of the plaintiff to quash the sheriff’s return and the replevin bon.d, was based upon the supposed incompetency of the legislature, to enact any law, having for its object the replevying of debts arising under contracts; and the objection to the sheriff’s return and the replevin-bond, were hypothecated on the idea, that, as respects the plaintiff’s demand, the act cited is inoperative, and conferred no authority upon the sheriff to take any replevin boYid, or to make a return upon the execution that he had done so.
in overruling the motion of the' plaintiff, the court below decided in favor of the validity of the act, and whether or not that decision be correct, this court will proceed to enquire.
We are not aware that any question of this sort has ever occurred, nor, in fact, could such a question he expected to occur, before the judiciary of any government possessing no-written constitution. In such a gov-*51eminent, the power, of the legislature, knows no limit 'short of its will, arfd whffteyer the/legislature enaets, continues to be- law orfiepeS'led by tí)je' Same power that enacted itivV^TKte admirers of such a government may declaipr&gdiinst.l.aws unjust in their nature and oppressive iii|peif operations, and. in the heat of their imaginatioa-ímííy tell us,, that all laws con-acknowledge íh£fj|ip^i|§?ekists no power whictdean control any thing wmpfemay be solemnly enacted, by the. legislature,.though the act be contrary to reason, and; though it b.e contrary to the nature of the social compact. irary to reason,afely»i'^^bmsu.bscnbing to the'opinion that parliamenf/tifíd^^ó'/eñí, they are constrained to
But such is not the nature of this government. Ken-, tucky is a member of the American Union, and that Union has a written constitution, which imposes limits-to the legislatures of the several states,‘beyond which none claim a right to pass. In the second section of the seventh, article of that constitution, the people of America, have declared, that “ this constitution, and-the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding/’ Whilst, therefore, this constitution remains unáltered by the same power that adopted it, and so long,as the. Union of the American States endures, it rñust be admitted the fundamental law of all the states, and paramount to the legislative acts of any of. the states. We might advert to the various adjudi.ciItions.of the supreme court of the United States, in support of the supremacy of the constitution; but the constitution itself contains, a declaration of its. own supremacy, and whatever is declared-by the constitution, can derive no-.additional forceby being repeated by the judiciary.
But it is not alone in the constitution of the United' States, that we are to look for restrictions upon the power of the legislature of this state. The people of Kentucky have adopted for themselves a written constitution, which also imposes limits on the' power- of ,the legislature, and which must be admitted paramount-to the acts of the legislature.. Beyond those limits prescribed ip,the constitution, the people h-*ve delegated *52no power to the legislature, and hav^ declared that any act of the legislature transcending those limits, shall be void. ' .
Regarding the constitution of the United States as the supreme law of the land, and regarding the constitution of this state as .paramount to the acts of the legislature, we are necessarily led, in considering the validity of the act in question, to examine whether, or not, there be any thing contained^ either of those constitutions, inhibiting the legislature'.from passing such an act.' t -
If there be not, the legislature must be admitted to have acted within its legitimate sphere, and the validity of the act must be maintained; but if there be, it is incumbent on the court to pronounce the paramount authority of the constitutions, and declare the act inoperative and void.
In proceeding with this examination, the court is not unmindful of the solemn obligations which are imposed upon it by the duty of its station. The question is one involving the power of the Legislature in relation to a subject upon which it has not for the first time acted, in the passage of the act under consideration, and the many private interests which, it may be supposed, may he affected by the decision, have produced in the court a deep sense'of its duty, and induced it to bestow upon the subject all that deliberation and reflection of which it is capable.
In the passage of the act, the Legislative department 'of the government, acting, as it is presumed it did, under the conviction of the paramount authority of the constitutions, must be supposedto have entertained the opinion, that no provision contained in either of those constitutions is violated by any thing contained in the act. But it is not in the opinion of the Legislature that the court is to search for the true meaning of the constitution. The high respect due from the judiciary to that department of government, should at all times induce the court not to pronounce upon slight conjectures, that the legislature has transcended its power’in the enactment of law. But the court is not to adopt the opinion of the Legislature upon trust merely. The constitution has made the Judiciary an independent and co-ordinalexdcparlment of the government, and its opinions mfistbe the result of its own reflections and deljh-. *53erations. ..“Each department, when acting within its -proper sphere, rhustf decide for; itself.upon the constitu#tion; but both must concurrir,favor of the constitutionality of a law, before that l'á.w*¿an»be enforced upon the people.' 0 ■
But to return to the examination of the question pro- . pounded — Is there any" thing in either the constitution of the United Sí^téi.pij'thÜtof this state, which forbids the passage of’thetl^|Mler consideration? ^ »
And first, ns to tlimpphstitution -of the UnitedvStates. The tenth se^tii^ToF the first article of that constitution, declares that “no state shall coin money, emit hills of credit, make any thing but gold or silver coin a tender in paymenf of debts, pass any bill of attainder, ex post 'facto law, or law impairing the obligation of contracts.”
It is the latter clause of this section forbidding any state passing any law impairing the obligation of contracts, that was more particularly urged and relied on in argument, as being incompatible with the act of the Legislature in question; and it is to that clause the attention of the court wall now he directed.
An.d here it should be borne in mind, that prior to the passage of the act under which the sheriff acted in taking the two years’ replevin bond sought in this case to be avoided, Brashears, Robert R. Barr and Warfield .had executed their bond, in which they stipulated to pay to the plaintiff, within one year, the amount of an execution which had previously issued against Brashears and Barr, in favor of the plaintiff, upon a judgment recovered by him against them in an action on their bond.
It is evident, therefore, that there existed at the passage of the act, a contract between the defendants and plaintiff, and that a contract too, of the description mentioned in the constitution. For in the bond which the defendants had previously given, they expressly agreed to pay the sum therein mentioned to the plaintiff within one year; and whatever may be the difference in the language employed by different expositors of a contract, they all admit, that an agreement between two or more, concerning something to be done, whereby both parties are bound to each other, or one is bound to the other, is a contract. But admitting such a contract ‡0 Jifive existed, before it can be determined whether or *54not its obligation is impaired by the act of the Legisla-.. ^ure5 we a!'e necessarily led to ask1 ourselves, what it is that constitutes the obligation of a contract1?
That man is underan obligation to perform his lawful' engagements, is. a proposition which none pretends to controvert. Whilst moralists differ, and casuists dispute about the cause of such an obligation, they all agree, that even in a state of nature, man is bound to fulfil his contracts. In such a state,'without the aid of civil laws, the obligation addresses itself to the moral faculty, and operates upon the conscience of men; and is denominated the moral obligation of a: contract.
If, however, such were the only obligation of a con-. tract, the practical effect of the limitation upon the. power of the states, contained in the constitution of the United States, could not be distinctly perceived. For although this moral obligation of a contract may exist in a state of civil government, its force is derived from the nature and fitness of things, and could not he impaired by the acts of the legislature, if under no res-, frictions from the constitution.
But iñ a state of civil government, contracts may de-. rive an additional obligation; an obligation which arises from the civil laws of the government, and which, but for the limitation contained in the constitution, might have been impaired and totally annihilated by the legislatures of the states. This obligation operates through, the medium of the sanction of the law, and, consists emphatically in those temedles which t.he law .supplies, and may be denominated the legal obligation of a contract.
To be under an obligation to do, or not to do a particular thing, necessarily implies coercion of some sort. The coercion may act either internally or externally; internally, as in the case of a moral obligation, which operates on the conscience of men; or externally, as in the case of a legal obligation, which operates by the public force, through the instrumentality of remedies prescribed by the civil law. But where there is no legal remedy, how is it' possible for there to exist any legal coercion? or if it exists, in what, it may be asked, does it consist? The law may command this tobe done, or that to be avoided; but vain and useless would be the command, unless the law also declares, this shall be the consequence of a non-compliance, and remedy he given. *55to enfoftfé jit* Without any command from the civil law, man is under amoral .obligation to perform his contracts, and his obligation is of precisely vthe same sort, still addressing itself alone to his conscience, after the civil law commands a performance, unless, through the instrumentality of remedies-furnished by the law, obedience to the command may be enforced.
Upon what principle other than that of the legal obligation ,of contracts^ cpnsisting in the remedies, is it, that eter since the^naetment of the statute against frauds and perjuries; verbal contracts for the sale of lands have been}'thought to creaté no legal obligation? That statute no where prohibits the making of contrdcts of that sort; it barely declares that no action shall be brought to charge any person upon such contracts. Men now possess the same moral power to contract, that was possessed by them before the enactment of that statute, and by parol contracts, may impose upon themselves the same moral necessity to fulfil their contracts; yet inasmuch as all remedy upon contracts of that sort has been taken away by the statute, we are repeatedly told by the. most eminent judges, that such contracts produce no legal obligation; or in other words, that such contracts in legal contemplation are void.
If, therefore, the obligation of contracts be what we have supposed, the consequence would seem naturally to follow, that as respects the present case, the act of the legislature in question is in conflict with that provision of the constitution of the United States, whichifor* bids any state from passing a law impairing the obligation' of contracts. For prior to the passage of that act, as we haveal ready seen, the defendants, Brashears, Robert R. Barr and Warfield, had expressly contracted to pay, within twelve months from the time of contracting, the amount therein mentioned, to the plaintiff; and that according to the law then in force, upon their failure to make payment, an execution might have issued upon the bond executed by them, and that under-the execution the sheriff would have been bound to permit no further delay, by any additional replevin: Whereas, according to the provisions of the act in question, it was required of the sheriff, when acting under the execution which issued in favor of the plaintiff upon the previous contract, to take from the defendants a replevin bond for the payment of the amount thereof, witli$intere$t *56and costs, within the farther time of one year f' and that uPon receipt °P such a bond, the sheriff was moreover required to return the same, together with the execution, to the office of the clerk from whence the execution emanated, instead of proceeding under the execution to make the money, and pay the same over to the plaintiff, as -by the law in force at the date of the previous contract he should have done.
By the act in question, it is true, the obligation of the defendants’ prior contract has not been entirely destroyed. After the expiration of the’replevin allowed by the act, the plaintiff’is permitted to sue out an execution, and in possibility might ultimately succeed in coercing the payment of his debt. But during the time of the replevin which is allowed by the act, all pre-ex-isting remedies upon the prior contract, are suspended, and the obligation of that contract thereby weakened and impaired. To be in conflict with the constitution, it is not necessary that the act of the legislature should import an actual destruction of the obligation of contracts; it is sufficient that the act imports an impairment of the obligation. If, -by the legislative act, the obligation of contracts be in any degree impaired; or, what is the same thing, if the obligation be weakened, or rendered less operative, the constitution is violated, and the act, so far, inoperative.
We know, that the provisions of the act in question, do not imperatively command sheriffs in all cases not to proceed to the collection of the demand contained in any execution, after a replevin bond is tendered to them. The act permits the plaintiff in any execution to endorse thereon, that either notes on the Bank of Kentucky or its branches, or notes on the Bank of the Commonwealth of Kentucky or its branches, may he received by the officer in discharge of the whole of the execution; and when such an endorsement is made, the defendant is not allowed to avail himself of the re-plevin, which in case of no such endorsement being made, is permitted by the act. But if we are correct in supposing that as respects pre-existing contracts, it is incompatible with the constitution for the legislature to pass an unconditional replevin act, surely the.condition upon which the replevin allowed by the act in question is made to depend, cannot render the act consistent with the constitution, if the validity of the act *57éepénded Upon the question, it might be deserving con* slderation, whether or not, if the act would have -been otherwise constitutional, the condition'upon which the ®flefendants\|ight to a replevin is made to depend, would nót-p'roduce a conflict with, the constitution, in consequence of its tendency to compel the plaintiff to receive in payment of his debt other currency than that of gold and silver coin. Be that, however, as it may, it is ftot perceived how it as possible for a condition of that sort to-render an ^ae.t consistent with the constitution, which, without such a condition, would be in collision with that instrument Notwithstanding the condition, the defendants have,- through the operation of the**act, by replevying the plaintiff’s debt, suspended for t;he time all pre-existing remedies; and conseqpently the obligation of the contract must have been as effectually ■impaired by the act, as it would have been by an act giving an unconditional replevin to the defendants»
But in argument we were told, that to prescribe rem-r edies for the redress of injuries, is a subject which falls exclusively within the sphere of legislative discretion, and that in all well regulated governments, those remedies ought to be modified, altered and changed, so as to suit the condition and exigencies of the community; and it was contended that the constitution ought not to be so construed, as to limit the power of the state legislature, in relation toasubject of such vital importance to the welfare of the community.
That to prescribe remedies falls within the province of the’legislature, is a proposition which will not be controverted by the court; nor does it follow, from any thing which we have said, that the legislature may not, according to its discretion, alter and change existing remedies, if by the alteration, the obligation of contracts be'not impaired. Agreeable to our notion of what constitutes the obligation of contracts, we acknowledge that as respects'remedies upon pre-existing contracts, the constitution of the United States has prescribed limits to the power of the legislatures of the several states.
• But what should be more naturally expected to be contained in a written constitution, than limitations upon the powers of the different departments of government? And m the written constitution of the American. Union, what should he more naturally expected, than *58limitations upon the power of the legislatures of the ch£ ferent states? One^great object to be effected by all written constitutions, is, to define with precision and certainty, the power which is intended either to be reserved to the people, or delegated by them to others; and by suitable barriers, to prevent those invested with authority, from encroaching upon the rights reserved to the people. And if, when deliberating upon the subject of their government, the people of the American Union have thought private rights worthy their notice; if they have thought that such rights deserved to be preserved by an article in their fundamental charter; if m that charter they have solemnly declared that no ■state shall pass any law impairing the obligation of contracts-, it is not for this court to question the policy of that declaration, or by an overstrained construction, to ¡render that declaration ineffectual.
And unless that declaration imposes limits to the power of the state legislatures, in relation to remedies upon pre-existing contracts, what operation, according to any rational construction, can it possibly have?
In argument a distinction was taken between the right and the remedy; and we were told that although the remedy be changed or suspended, the right may remain ; and it was contended that the constitution may have an operation to restrain the state legislatures from the enactment of any law impairing the right, without construing it to impose limits to the power of the legislature in relation to remedies.
But if we are correct in making the legal obligation of contráete consist in the remedy which the law af-. fords, it is not perceived how the constitution can have an (Operation to preserve the right inviolate, unless it be understood to restrict the power of the legislature over the remedy. Though no legal remedy be afforded me, I may, nevertheless, have a right to that which I contracted for with others; but in strict propriety, the right cannot be denominated a legal right. It exists in naturaljustice only, and can neither be diminished nor impaired by the acts of civil legislatures, and needs no constitutional provision to preserve it. But not so as to the legal right. Obligation and right are correlative 'terms. Whenever there exists a right in one person, there is a corresponding obligation upon some other person or persons; and if there be no legal obligation *59épónsanj person, no person can have any correspond: i'ng/ega/ right. If, therefore,:, the legal obligation contracts consists in the legal remedy, an unlimited¡control over the remedy, is equivalent to an unlimited-com. iróltover the right; for in the same proportion as the-legal obligation is diminished: suspended or entirely-destroyed, by relaxing, suspending, or abolishing the le--gnl remedy, so in the same-proportion is the legal right either, impaired or destroyed.
Hence it is that we are told, that it is a general and indisputable rule, that “ where- there is a legal right,, there is also a legal remedy,.by suit or action at law, whenever that right is invaded,” and that “ the w-ant.of fight and the want of remedy is the same thing. — 3 Bl. Com. 23; 1 Bac. Ab. title, Actions in general, letterB.
But it was again said in argument, that contracts are made by the parties with a view to the remedy, which may thereafter be afforded by the legislature; and if the obligation of contracts consists in the remedy, it was urged that the obligation is of the potential sort,, depending upon such future change in the rdftedy, as. the legislature may think proper to make.
The argument, though specious, is, nevertheless,- not, solid. It assumes for granted, that which we have beca attempting to combat; it assumes.the power of the le, g-isiature to diminish the-force of remedies upon preexisting contracts, and thence deduces a conclusion favorable to the existence of such a power. But if, as we suppose, the constitution has interdicted the ex-erm|e of. such a power by the legislature; and if the constitution be the supreme law of the-land, it is not tobe admitted* that contracts are made by parties with a view to the legislature thereafter producing a change in the rem-. edy, contrary to the provisions of the constitution; nor can the obligation of contracts be admitted t.o depend, upon the legislature so doing,.
But in argument we were referred to- two adjudica-*, tions of this court, both-of which, it was contended, go to maintain the power of the legislature- to change the remedy upon pre-existing contracts. The first is- the case of Grubbs, &c. vs. Harris, 1 Bibb 567, in which it, was decided to be competent for the legislature to ]fo: vide a more summary remedy for the recovery of debts, t han existed at the time of making the contracts. The other is the case of ’Rearden vs. Searry’s heirs., 2 Bibb *60202, in which it was decided tobe competent for the legislature, after the d,ate of a contract, to subject to1 its satisfaction, land which was not subject at the date of the contract.
There is, however, nothing in either of those cases incompatible with the construction which <■ we think ought to be given to the constitution. According to our construction, it is only where by a change in the remedy the obligation of contracts is impaired, that the constitution is violated; and in neither of those cases was the obligation of contracts impaired by the act of the legislature then under discussion. The change produced in the remedy by each of those acts, was neither less tardy, nor less beneficial to the plaintiff than the pre-ex-isting remedy, and it is impossible to perceive how the obligation of contracts can be impaired by either accelerating the remedy, or by making a fund subject to their satisfaction, which was not so when the contracts were made.
But again it was said in argument, that if our construction-of the constitution prevails, the same system of courts must irrevocably remain, without even being subject to the control of the legislature as to the time of their sessions, contrary to the invariable practice of all the states in the Union.
The conclusion is not, however, admitted to follow from the premises assumed. To give the argument any sort of plausibility, the position must first be established, that courts constitute a part oflegal remedies. But we deny the correctness of such a position. Courts are erected for the purpose of deciding contested rights, when those rights are drawn m question and brought before them through the instrumentality of remedies prescribed by law; but courts exist independent of those remedies, and, in a legal sense, compose no part of them. To create, alter and abolish courts, and to change their sessions, is a subject which falls properly within the sphere of legislative discretion, and we know of no provision in the constitution which limits the power of the legislature upon that subject, except as to abolishing such courts as the constitution has established; though in exercising that power, private rights may be incidentally affected.
But again, in argument we were told, that in actions brought in the courts of this country upon contracts *61made in other states, the principle has been recognized áhd repeatedly acted upon, of referring to the laws of the state’where the contract was'made, in giving a de-cisión upon the nature and construction of the contract, whilst, at thé same time, as respects the remedy, the la.ws enacted and in force here, were admitted to govern; amd if the obligation of contracts consists in the' remedy, it was emphatically asked, why the distinction,>and why not advert to the laws of the state where the contract is made, as welffor the purpose of ascertaining the remedy, as for the purpose of deciding.pn the nature an‘d construction of the contract?
We answer, that there is nothing in the distinction incompatible wiih the construction which we have given to the constitution, and that it is taken upon the principles of international law, as it is recognized and acted upon by all civilized states.
It is only coextensive with the territorial limits of the state, that the civil laws of any state can have any operation; and the obligation which contracts derive from those laws, must necessarily be circumscribed by the same limits. It is, therefore, utterly impossible that an obligation derived from the laws of one state, can he impaired by the laws of any other state. In conformity to the distinction adverted to in argument, we know that the courts here refer to the laws of the state where a contract is made, in deciding on its nature and construction; but in doing so they do not proceed upon the notion that the contract brings with it her?, the legal obligation which it derived from the laws of the state where it was made. In referring to the laws of the foreign state for that purpose, the courts here acknowledge that all persons are every where under a moral obligation to perform their contracts, and go upon the idea that wherever that moral obligation grows out of a contract conforming to the laws of the state where the contract was made, there is, through the medium of legal-remedies prescribed by the laws of this state, a legal force given to that moral obligation. But there is no provision in the constitution of the United States, which requires each state in the Union to ¡^ve the same legal obligation to contracts made in any state. The constitution, in that respect, has prescribed no limits to the power of the states; and this state, in conformity to the general principle, of comity between states, *62through the medium of remedies adopted by herself, has communicated to contracts made in,'other states, a legal obligation, when those contracts conform'to the laws of the state where made; and the courts here are, accordingly, governed by those remedies.
But in argument, the validity of the act was finally at<* tempted to be maintained, upon what was contended to be a cotemporaneous construction of the constitution, favorable to the power of the legislature to enact such laws. And in support of that construction, we were referred to an act of J;he legislature of this state, which passed at the session of 1792, allowing replevins upon pre-existing contracts; and, also, to an act of Congress of the same date, requiring the marshal when acting under any writ otfieri facias, which shall issue from any court of the United States, in causiug an appraisement of the defendant’s goods in execution, t-o. be governed by the laws of the state, where, by the laws of the state then in force, an appraisement ©f the defendant’s goods taken in execution, was required; and we were, moreover, refen-ed to an act of the Virginia legislature, which passed prior to the adoption of the constitution of the United States, hut which was in force at the date of the act ofCongress of 1792, requiring estate taken under writs of fieri facias, to be appraised, and authorising a replevin for twelve months to the defendant, in case the estate would not sell for three fourths of its appraised value.
The circumstance of the legislature of Virginia having enacted a replevin law prior to the adoption of the constitution, and not having immediately after the constitution was adopted, repealed that law, affords no convincing evidence of what was the understanding of that body, as to the power of the state legislatures to pass replevin laws, after the constitution had become the fundamental law of the United States. The circumstance of the legislature of that state having enacted such a law prior to the formation of,the constitution*, may have contributed to induce the framers of the con-, stitution to insert the provision in that instrument which we suppose was intended-to prevent the future enactment of such laws; and may not the legislature of Virginia have been influenced to forbear repealing the law from a conviction that the provision of the constitution now under consideration, could have no other *63%han a prospective operation, and not because the mem-blrs of that body entertained the opinion, that notwithstanding the constitution, the legislature still possessed tne power to enact replevin laws to operate upon pre- ‘ existing contracts? And may not such have been also the, construction which the Congress ofT792 put'upon the* constitution? Or, knowing that the provision of the constitution now under consideration has no application t'o the powé'^of Congress, may not that body, without' intending to expres's a solemn opinion on the power of the legislatures'of the several states to enact replevin laws, have thought proper to adopt the laws enacted by the states, as a rule for the government of the marshal, whilst acting under the process of the courts of the United States?
‘ And after having adopted the laws of Virginia, may not the legislature of Kentucky, of 1792, have enter-táiñed the áame opinion, as to the construction of the constitution, that we have supposed may have been entertained by the legislature of Virginia; and instead of supposing that no limitations are imposed ciT>he power of the state legislatures, in relation to replevin laws, by the, constitution, may not that legislature have thought, that as by the act which it was then enacting,, the term of replevin was about to be reduced from tvrelve months, as allowed by the Virginia act then in force here, to three months only, the provision of the constitution against impairing the obligation of contracts, could not be thereby violated, though a contrary opinion might have been entertained, if the term of re-plevin allowed by the then existing law had been extended? And, without adverting to the peculiar state of the laws of this country when the act of 1792 was enacted, may not subsequent legislatures in this state, have considered the enactment of tha't act as a legisla* tive construction of the constitution; and concluding, as it was natural they should conclude, that if the legislature is not restricted by the constitution, from passing a replevin law for three months, it is n'ot restricted from passing such laws for one, two, or an hundred years? And, acting under the influence of that precedent, may they not have enacted the various other replevin laws topfle found in our statute books, without giving to' the destitution that consideration and reflection, which, under different circumstances, it would have received?
Replevin tíalljTmpair the obligation of con-are°unVonsti-iutional, wben pros-asCweU°asy' when retrospective also.
Blit, supposing the legislature of Kentucky not to ^ave ^óen influenced by considerations such as we have suggested, and admitting the members of that body to have entertained the opinion that the constitution imposes no limitations on the power of the legislatures of the states, in illation to the enactment of replevin laws, sjill.the constitution remains the same that it was when first adopted by the states; and wbateyer respect may be entertained for the opinions of the members of the legislative department of the goverñmeñt, the court is nevertheless under the necessity of deciding according to its own conviction of the correct import of the constitution; and the result of that conviction is, that as respects pre-existing contracts, the act under consideration is in conflict with the constitution, and that the sheriff derived no authority under the act, to take the replevin bond and make the return upon the execution now sought to be quashed.
Without going into an inquiry as to the constitution of this state, therefore, the judgment of the court below, overruling the motion of the plaintiff to quash the re-plevin bond and sheriff’s return on the execution, must be reversed^and the cause remanded to that court, and judgment there entered in conformity with .this opinion. The defendants in that court must pay the costs of both appeals in this court.
OPINION OF JUDGE MILLS, IN THE TWO PRECEDING CASES.
THE main question made and debated in these causes, the answer to- which may supersede all others, *s’ d°es the law of this state, passed on the 25th day of December, in the year 1820, or rather, that part of it which subjects the creditor to a stay of two years, on debior’s giving bond and security, unless the creditor shall endorse on his execution a willingness to accept notes on the Bank of Kentucky, or Bank of the Commonwealth of Kentucky, violate the tenth section of the first article of the constitution of- the United States, which declares that “ no state shall pass any bfll of attainder, ex post facto law, or law impairing the obligation of contracts,”
*65'' This important and delicate question must now meet With an jpswer, from this court, and it is conceived that the answer can be clearly and satisfactorily given, from thafollowing reasons and considerations : 1st, The meaning of the terms employed jin the constitution, ap-pito the law in question; 2dly, the*eíSessity,.of'ih-serting such a clause; 3dly, the circumstances, under which it wa&mdopted, which pointed out the cases jp which it ap pues; and 4thly,'the cotemporaneous exposition of it, anfihjudicial decisions under it.
First, the meaning of the terms employed. Thfle only need be noticed, “ contracts” “ obligation” and “• impairing.” The meaning of the word, “ contract,” is known to every ordinary capacity. It means an engagement or stipulation, whether written or verbal, to do, or not to do, a particular thing, assented to by theperson to whom the-engagement is made. This is the definition, in substance, of Powell and Newland, two able writers on contracts, of the supreme court of the United States, Sturges vs. Crowninshield, 4 Wheat. 122, Dartmouth (College vs. Woodward, ibid 518; and it is the definition ®sfed, not only by Dictionaries, but of common sense. It is therefore clear, that every bargain to pay either inoney or goods, or to perform labor or services, or to abstain from any act, between individuals, or parties able to contract, is within the meaning of the term. As to “obligation,” we. need not go to the civil law or Roman code, .as said in argument, to ascertain its meaning. If we were to resort to that source, we should find the same definition which is easier obtained elsewhere. The word is derived from the Latin -word’ obligado, tying close up, and that from the verb obligo; to bind or tie up, to engage, or oblige by the. ties of promise, oath or form <flaw; and obligo is compounded of the verb ligo, -ip bind or tie fast, and the preposition ob, which is affixed to increase its meaning. This intimates its sense. But here 1 need not tarry, but will resort to that source for the signification of the word, which is more accessible to, and understood by every ordinary capacity. Our four most approved lexicographers, Johnson, Sheridan, Walker and Jon'tss, all in substance define the ,;^rd to mean the binding power of any oath, vow, duty wskcontract; an act which binds any man to some per-j&rmance. The obligation of a contract is, then, its. is that which compels its perform--*66anee. 'In other words, it is, as defined by the supreme court, of the’Unite'd States, 2 Wheaton 197, uihe law-of the contract.”
Now, we know that some contracts are made bylaw, such as compacts between'states and corporations, b©-tweenltwo d® rlfo-re states, or treaties with foreign powers. The terms are agreed upon and written in the form of law-, which may have no sanctions^,,but which, in their essence, consist of law; and a violation of them not only affects the contract, but breaks the law itself, which is the obligation of the contract. But contracts between individuals, voluntarily made, and abstractly considered, have no law in their composition; but the law of the land says, that they shall be fulfilled, as made, and applies remedy in case of breach;.and both these constitute the “ obligation" Thus, for a full.consideration, 1 engage to pay money on a particular, day; 'the law, independent of remedy, as well as- the words of the contract, says I shall do it. .If I do, I comply, not only with the words of my engagement, but also with the law, and thus fulfil the obligation. If I fail, I violate the obligation, and subject myself to the sanction of the law, which is styled remedy. If, then, the contract was tolerated by law, in its inception, and was such an one as the law said should be binding, and the legislature of a state shall say that it shall not be binding, the act would contravene the constitution; and if they take away the remedy, or so protract it, as to render it useless, the constitution is, in like manner, violated. Any law, therefore, of a state, which declares that legitimate contracts shall not be fulfilled according to their terms, or indirectly reaches the same object, must violate the obligation intended by the constitution.
On the meaning of the word obligation, some definitions have been offered in argument, which will he at tended to. The distinction has been taken between the moral and legal obligation of a contract. The moral obligation has been said to be that force upon the conscience, which every one feels. This distinction between moral and legal obligation, is well founded, and the definition of moral obligation is correct. But nothing is gained by it; for it cannot be seriously contended,. that the moral obligation alone, was in the eye'djf the convention. Why should they so suspect the n$o-rality of the people, as to address to thepi, in this sh ape, *67ibis moral desson? é Why should th^y,,$n giving the Bioral precept, noficiirect it to each individp'ál,. arid.ap•peal to his bosom, instead of the states, and* indexed to • thetiaas^and sot to the moral chafáctplrof thestates? T&S.q^5tcé sho’ws that'the\ijioral obligation was not the only’thing intended to be preserved? -tfeut, Suppose* i*is conceded that the moral obligation only is intended, what isjgained by the concession?' The moral sense, of the creditor teaches him that the debtor ought to-pay; thatofthe debtor, that he ought tó comply. / But, the law interferes between their two consciences, thus .correctly instructed, and imposes upon the creditor the Necessity of owning that his moral sense is wrong, and relieves the conscience of the debtor from any com-on account of non-performance. Could such. ■ law be said to have no effect-upon the moral obligation?, of .the contract? , ;
Again, it has been said that the. obligation intended" by the constitution, means the confidence reposed by ■ the contracting parties in tbe government, that redress .ji^all be afforded for a breach; or, in other .fjords, that ■’tbe potential ability of the government to afiord red'réss. . of some kind, to be determined by the law, when i't is resorted to, is what was intended by the word obligation. 1 shall now examine this position. Read the constitution according to it, and it will be confuted. “No state shall pass a law impairing the confidence of the- - citizens, reposed in the government, that it will furnish remedy to enforce contracts;" or, “no state shall pass laws impairing the potential ability or power of government to enforce contracts, of some kind, or other!!”' What reason had the convention to guard this confidence in government, which the citizens might possess?' Was it wise to bind the states to preserve this confidence, and leave them at liberty to furnish either a speedy and convenient, or a slow and lingering remedy, or norie at all, at the same moment? 'Why protect the-■potential arrh of the state governments, to enforce contracts, by the provisiQn in question, when that potential power would exist aswcelf without the provision as’Wth it,- and still leave the states at liberty to apply no remedy, or'that whtch was equivalent to none? Such a pro-, TOSi'Cm would not have been remarkable for wisdom and .sagacity. 'What is more, yield the definition to be correct, with allots unwise features, and; it will he hard *68still to exempWj.be law in question, ylf obligation means the confidence of 'the creditor that'- remedy fronjfgov-eminent will be afforded, does a law which reta'fds or enervates that remedy, not weaken or impair that con-^dence? If the 'potential ability of government, toaf-ford retnedyifof'Some kind, is intended, is that law valid, which removes or extends the application of that potential power from one time to another, even after judgment? The proper answer to these inquiries will show thatdhe definition contended for will not escape the effect of the constitution.
Again,, it has been contended, that the words, “ impairing the obligation of contracts,” are a redundant inode of expression, and mean nothing more than, the expressions. “ impairing contracts,” used in our own constitution; and therefore, if part of the amount of the contract is not taken away by the law, it is not impaired, whether the remedy be or be not retarded or denied. I am not disposed to admit this construction. A contract between individuals, as before illustrated, maybe spoken of in the abstract, as a simple idea, without including the compound idea of the law blended with it; and" the word, obligation, was inserted to prevent this, and to express, include and preserve the binding power attached to the contract, that is, the law, and to remove the doubt and avoid the effect of construction; and thus it cannot be contended that the contract being left entire, the constitution is not infringed, although the law has left the contract unregarded, without remedy. But this construction, however, is as vulnerable as the former, even if its correctness be admitted. If the law is not intended in the expressions, “ impairing contracts,” the clause does nothing at all. A contract, in its simple form, unconnected with the law which operates upon it, if ever made, is a fact that will exist, whether the law notices it or not. if government should say that there should be no remedy to enforce it, or that it should be enforced partially, or by half, or any other proportion, still the fact would exist, that there was such a contract,' and all the powers of legislation could not blot it from existence. A prohibition, then, not to pass laws impairing contracts,” if construed to embrace only contracts, without the law of contraéis, wmuld be a prohibition restraining the legislature from doing what, they never could do, and would of course be nugatory. *69Tbis simple expression,. the®,.' “ impa ión.§|, contraets,’-’ leajying*aut th'e word’M%ffi¡i«i,\-must ¡raye re^iUinn amí inciudtathq law of contracts,' or >hraan nothing^ w%s, andy| wpil known, that there are many contracts wfffeh^tlffsiaws of no government can of ought to en-for«í. Such are counted void, and are not.noticed .sco*ftcts in legal parlance. It is not every contract which government extends its aid. For instance, executory agreement made by one citizen to lend to other, in common parlance^ is. a contract; yet, »if lender refuses toffuldl it, the law affords no aid. Gam* ing and usurious contracts, and contracts against moral* rifi or the policy of the state, and all those which forbidden by law, in their inception, are contracts, common parlance, according to the simple idea of term; but yet ;they are not legal contracts, and could notybe intended to be secured by either our own, or constitution of the United States. It must, therefore, be those that include the compound idea of law ■them, which alone were intended by the constitution state.
. he word means, according to the same standard writers in. our language, before quoted, by which we teach our children in our ovvn tongue, simply “ to diminish, to injure, to make worse,” &c. it is remarkable that the convention did not use the term “ lessen, or increase, or * destroybut one more comprehensive, which prohibited "the states, even without altering, lessening or increasing, from making worse in any respect, a contract legitimate in its creation. The object, then, of this provision, must have been to establish an important principle, and that was, the entire inviolability of contracts. The inquiry, then, must be, with regard to every law affecting contracts, or operating upon either right or remedy, doos it lessen the value of the contract, or in any measure render it worse? If it does, that law is repugnant to that clause of the constitution in question. Does the present law do this? Without the law, the debtor wo’uld be bound to make present Ipay-men.t; by the law, without the assent of the creditor, he has two years, then paying only the same sum with itsfi-nterest, and the credifor only receives further assurance by the security given, that, in the mean time, the debt shall not be^lost.1 Is the money paid down, of the “impair,” is familiar to every ame, .and *70same valuq^with that sum paid two years hence? or, is a cQPlli4c^ now to be certainly coerced,-wprthtno more than.that tó be coerced two years- hence?» If ^brought into market, .will .they command equal valué? Coin-mon sense must answer these questions in the negative. It, therefore, follows, that the present law'is unconstitutional, and cannot be sustained.
I shall now proceed to the second consideration, viz. the necessity of such a clause in the constitution. An-terioiyto the constitution, the states could violate or impair contracts. The states were then, and are now, evidently commercial. Debt is the offspring .of commerce. If promptly paid, it is the life of commerce-fuf delayed, commerce languishes. Permit the three-states of Massachusetts, New-York and Pennsylvania, to contract what debts with foreign countries they please, and then by the interposition of their legislatures to retard the payment of these debts; say these debts are d‘ue to Great Britain, our ancient enemy, w'hose existence depends upon commerce and upon punctual payment; how could there be a more certain and better cause, jp£ hostilityYthan such a procedure? Thus, these statés would embroil the remaining twenty-one, and the whole may be disturbed by the acts of a small portion. Again, it was foreseen that the states must be drawn together in a closer bond of union and intercourse, than foreign governments could be to each other. All their dealings m'ust be upon terms of mutual reciprocity. If this was not the case, how could the Union exist? If one was to become the debtor of another, and then by its municipal regulations, restrain the collection of that debt, would not offence, retaliaifion and quarrels between state and state, be the inevitable consequence? Indeed, in our own code of 1815, there is a retaliatory provision, which directs the courtthat rendersjudgment in favor of a citizen of another state, to enquire whether the collection of debts were suspended by the laws of that state to which he belonged, and if the fact was found to be so, to enter a positive stay for a year, whether he would accept paper or not. "It is impossible to conceive, how far such measures, \n a state of irrita-; lion, might be carried, and how speedily the Union might be marred or dissolved' by the exercise of such a power. Moreover, our revenue depends on our duties' on foreign merchandize, and perhaps :‘three fourths of *71it is collected 'frorriN.the thr^ee- statfes^ppiged, and,, of course*,' is ,Wended jyith .pfrivate debt! All^pir “these,-stájfcpsitb: shiij£their banks, suspend lasr process^ and' restrain tbejfuliilment of contracts, on-which the gre'atest, po^flotpOTthc? revenue.pf the Union depefids, ni| would vitally cut the sinews oí government, and mar the peace ^f-tB^whole. These were the portending evils of the day, anterior to the constitution; and ^realizing these with others, the.worthy patriots who formed the constitution, inserted these respective 'clauses, which operate on the preset-controversy. We will see that’íhése dangers- were not imaginary, but real, when we now- attest to, the third consideration proposed, and that is, thp circumstances under which this clause, with the rest of the constitution, was adopted.
This, involves the history of the United States, between the *year 1783, when the peace was adopted, and, the year 1789, when the constitution took effect, a period of six years. From this period, I shall .collect some prominent evils, which evidently, caused this contested provision. According to the usual rule of at-’ t%ding to the old state of things, the mischieffend the remedy, we will be enabled to ascertain the design and extent of that remedy. At the commencement of the revolution, our merchants were deeply indebted to the merchants of Great Britain. These debts, by an uncontrollable necessity, were suspended duringthe war; b.ut at the peace of 1783, they were revived by the, terms of the treaty. That treaty found nearly all the states with laws in force, which suspended the -collection, of debts, or provided for their payment in property, or made them dischargeable in paper-money. The effect of these laws, directly operated upon the British creditors, and they became clamorous to their government, Great Britain, to retaliate, refused to surrender, according to treaty, the posts within our boundaries, and supported the hostile acts of the savages, to the annoyance of our frontiers. When John Adams was sent as minister to that court in 1785, to complain of these grievances, he received promptly for answer, that the states had violated the treaty, by suspending the collection of debts. — See Ramsay’s United States, 3 vol. page 177; Ram. Life of Washington 259. ,-Gur minister"failed in the.negotiation and returned home; and the matter was never accommodated until-long af-*72ierwards. during the administration of "Washington, un* •der the constitution. What is more, at the conclusion of.the peace, large.iquantities of merchandize were im-portéd, and new debts created, trusting to,the supposed affluent times of the peace, for payment. This pr'ospect failed, and in consequence of it, the states, or a number of them, after the peace, passed new laws, interfering between debtor and creditor, and delayed collection. — - See Marshall’s Life of Washington, vol. 5, page 75. This increased the difficulty between this country and our ancient enemy, and called forth the censures of the father of his country, Washington, then in retirement at Mount Vernon, in one letter to a member of. Congress, he observes: “ it was impolitic and unfortunate, if not unjust, in those states, to pass laws, which, by fair construction, could be considered as infractions of the treaty of peace. It is good policy, at all times, to.put one’s adversary in the wrong. Had we observed good faith, and the western posts had been withheld from us by Great Britain,- we might, have appealed to God and man for justice.” To another member he saj's: “ What a misfortune it is, that the British should have so well grounded a pretext for their palpable infractions, and what a disgraceful part, out of the choice of difficulties before us, are we to act.” — See Ramsay’s Wash. 259. A list of these laws was collected by Mr. Hammond, the British Minister, and presented to the Secretary of State, Mr. Jefferson, as a list of grievances, and will be found in 1 State Papers 252, and amount in number to twenty-one. Of these, it will be sufficient to notice only those passed after the peace. Virginia, in December 1783, revived her law suspending the emanation of executions, and allowed real and personal estate to be tendered in discharge of executions. In 1787, she removed this obstruction, or rather, substituted in its place a suspension by replevin, for one year. South-Carolina, in 1784, suspended the recovery of all debts for nine months, and then made them recoverable at four equal annual instalments, after the debt was replevied; and in 1787, that state extended the instalments, in some cases, of debts replevied, one year longer. Rhode-Island, in 1788, made her debts payable in paper money, or delivery of property; New-York did the same thitlg, and provided a fund of paper money to be loaned on credit for that purpose. Georgia.passed acts of the *73saíne nature. The rest of the states, or a number of '^tlierii, had their susptension^aets efthe^wtttftill ití force,' asWVilb appear by the 'corresp'ondencé betivéén'Jéffer-. stm and'Ham m o n d. S t a t e Papers, fcl.' 1, from page 296 " tó'327. ’But the infraction of-the British treaty by these laws/Stashot the only evil under which'the country la--(bbféd. ■ A short extract abridged and selected in the ,;fon’|jSiage of Marshall, in his Life of Washington, (page •85 to'88,) will suffice:
" - “ The discontents and uneasiness, arising in a great • measure from the embarrassment in which a great number of individuafewere involved, continued to become' more extensive. At length two great parties were formed in-every state, which were distinctly marked, and? which pursued distinct objects with systematic ar-ra'ngement. The one struggled with unabated zeal, for the exact observance of public and private engagements. ‘The distresses of individuals were, they ■ thought,' to be only alleviated by industry and frugality, not by a relaxation of the laws, or a sacrifice of the rights of others. The other party marked out for itself a more indulgent course. Viewing with extreme tfenderness the case of the debtor, their efforts were unceasingly directed to his relief. To exact a faithful compliance with contracts, was, in their opinion, a measure too harsh to be insisted on, and was one which the'people would not bear. They were uniformly in ' favor of relaxing the administration of justice and of af-' fording facilities for the payment of debts, or of suspending: their ■ collection, and of remitting taxes, in many states, the parties last mentioned, constituted a decided majority of the people, and in all of them it was very powerful. The emission of paper money, the delay of legalproeeedings, and the suspension of the collection of taxes, were the fruits of their rule, wherever thf.y were completely dominant.” The same author speaks of the contests and alternate victories of those parties, and then proceeds to observe;.. “ This uncertainty with respect to measures of great importance to every member of the community; from this instability in principles, which ought, if possible, to be rendered immutable, proceeded a train of ills, and is seriously believed to have been among the operating causes of those pecuniary embarrassments, which, at that time, were so ge'n§ral, as to influence the legislation of almost every state ,ia *74the Union. Its direct consequence, was, the lossHof confidence in the government and in individuals.”" After detailing the ills of this state of things more fully, the same author a'dds, page 87: “The prospect of extricating the country from these embarrassments, was by no means flattering; whilst every thing else fluctuated, some of the causes which produced this calamitó'us stale of things, 'were permanent. The hope and; fear still remained, that the debtor party would obtain the victory at the elections; and instead of making the painful effort to obtain relief by industry and economy, many rested all their hopes on legislatiye'interference. The mass of national labor and of wealth, was conseqnenl- . ly diminished, in every quarter were found, those who asserted it to he impossible for the people to pay their public or private debts; and in some instances, threats were uttered of suspending'the administration ofjuslice by private violence.” These threats were absolutely executed in the state of Massachusetts, which occasioned the famous insurrection in that state. The same author, in describing the object of these insurgents, in page 112, says: “ Their hostility was principally directed against the compensation promised to the officers of the army, against taxes, and against the administration of justice, and the circulation of a depreciated currency was required, asa relief from the pressure of public and private burdens, which had become, it was alleged,-too heavy to be borne.” Col. Humphreys, of that state, to whom General Wasbington had written, to know the cause of these disturbances, says in reply: u It rather appears to me that there, is a licentious spirit prevailing among the people; a levelling principle; a desire to change; ■and a wish to annihilate all debts, public and private.” Col. Lee, then a member of Congress, and formerly an active and distinguished revolutionist, in describing the same insurrection, says, in a letter to Washington: “ Some of the leaders avow the subversion of government to be their object, together zuith the abolition of debts, the division of property, or are-union with,Great Britain. In all the eastern states, the same temper prevails more or less, and will certainly break forth whenever the opportune moment may'arrive.”
To oppose this insurrection, the sword was drawn, and, civil war commenced; and after citizen had spilled the blood of citizen, the governmental army, *75^Ith general ^incoln at their head, were- successful in dispersing thé insurgents. Ramsay, in hfs History of the United Stales, more summarily'details the .same facts, andÜsay.s, in page 77, vol. 3: “State legislatures, in-too ;many instances, yielded to the necessities of their constituents,-and passed laws by wdiich creditors were Gpn^^yied, either to wait for payment of their just demands, oib thenender of-security, or to take property at a valuation, or paper money, falsely purporting to be the re-®-res.entative of specie.” Fisher Ames, an advocate- of sbé; constitution in his own state, and a member oF the .first Congress under it, some years afterwards, in- his funeral oration oil the death of Washington, draws a lively portrait of the gloomy times which succeeded the peace, and preceded the constitution, in .the following t^rms: “ The, system called justice, was, in somg.of the states, iniquity reduced ¡o elementary principles, and-the public tranquility was such a portentous* calm, as rings in deep caverns before the explosion of' an earthquake, ft was scarcely possible that such governments should not be agitated by parties, and that, prevailing parties should not be vindictive' and unjust. Accordingly, in some of the states, creditors wck treated as oullgms; bankrupts were armed with legal authority to be-persecutors; and by the shock of all confidence and faith, society was shaken to its foundation". The peace of America then hung by a thread, and factions were already sharpening their weapons to cut it.”
Such is the drawing of that sable cloud which then overhung the prospects of America, and such the facts and the history of the laws interfering between debtor and creditor, as recorded by the pen of the historian and described by the tongue of the orator; by those historians who saw the gloomy interval, and from whom we a-nd our posterity must learn the events of t’lrat day, and in .whose testimony we are bound implicitly to confide. Now it may be asked, at what system of legislation then practised by the states, did the clause of the constitution in question strike? All the mischiefs of thqt; day have their remedy in that instrument, and against the injury done to, or interference With contracts, was this clause peculiarly directed. If this was not intended, it will be difficult to say what other part of the instrument is. The conclusion is, therefore," ir-resistable, that the c'onvention did "intend, to restrain the *76states from the suspension of contracts, ,|¡nd that .such. laws are forbidden. Weweretoldin argument,thatthe states, at this period, were in the habit of repealing and annulling contracts, at least in the time of.lhe-'war, and to restrain this was the object. But in the history-of that day, no such practice is discovered. Debts-were often confiscated^ and the amount directed lobe p^id to the treasury of the different states; but no instance is found of a general release of debt. Of course, suspension, delay and commutation of debts for articles not called for in the contracts, must have been designed.
The fifth consideration proposed, will corroborate this conclusion. It was the cotemporaneous exposition of the constitution. The interference between debtor and creditor was then believed to be cutoff, as will be evident from the following testimonies, Lpíber Martin, a member of the convention, who opposed the .constitution, assigned to his constituents as one of the reasons of his opposition, that it prevented the interposition of the stales between debtor and. creditor, for the purpose of relieving from the pressure of debts, however great it might be, and refers to this -clause, as the one so operating, in his apology read at the bar in the argument of this cause.
During the period which intervened between the for-■noation of the fed-eral constitution and its adoption by the states, the letters of “Publius” made their appearance in the prints. Their design was to explain the constitution, and recommend its adoption. They were the production of Hamilton, Jay and Madison, and have since been republished and still exist, composing the well known volume entitled “ The Federalist” They are admitted on all hands, tobe the best comment on the constitution ever written, and are taken as high authority throughout the Union, and ought to be read by every American who wishes to understand the constitution. They claim additional weight, because they are the work of three distingushed citizens, who aided in framing the constitution, in commenting on the clause now in question, they clearly show that the extremes to which some of the states had proceeded, in interfering between debtor and creditor, was the occasion of inserting this clause, and that to restrain such interference, was the design and the true construction. When enumerating, ip the 7th number, the' probable causes of *77w&E^hich ihight arise between ike state&úfthey con-tinned to exist without, the constitution, 'Mr- .Hamilton-a&ys: “ Laws-in -violation of priyate-contracts, as they amount- to aggressions on the rights of those states w-hose citizens are injured by them, maybe considered as another probable source of hostility. We are not au-thori^pfkto expect that a more liberal or more equits-. ble spirit would preside over the legislation of the individual states hereafter, if unrestrained by arty addition-checksy&mn we have heretofore seen, in toomany instances-, disgracing their several codes. We have ob~ served'the disposition to retaliation excited in Connecticut,) inconsequence of the- enormities perpetrated by thelegi-slature of Rhode-Islancl; and we may reasonably ‘infer,. - that in similar cases, under other circumstances,-a war, not oí parchment, but of the sword, would' chastise such atrocious breaches of moral obligation1 and,social justice.” ' ■
indhe 44th number, Mr. Madison, when commenting on this very disputed clause, says, “ bills of attainder, ex* post.facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social-compact, and to every principle of sound legislation.* The two former are expressly prohibited by the declarations prefixed to some of the state constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favor of personal security and private rights, and I- am much-deceived, if they have not, in so doing, as faithfully- consulted the genuine sentiments, as the undoubt- - ed interests of their constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen, with ■ regret and with indignation, that sudden changes and legislative interferences, in cases affecting personal rights, become jobs in the hands of the enterprising and influential speculators, and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is hut the linlcofa long chain of repetitions; every subsequent interference being .naturally produced by the effects of the preceding. They very rightly infer, therefore, that *78some thoro.qgji reform is wanting, which-will- banish sPecidation on public measures, inspire a general prudence and industry, and give a regular course to the business of society.” ,
accordance with this construefion, the ofthe adoption of the federal constitution was, an absmdonment by nearly all the states, of these laws of del,ay and interference between debtor and creditor. Virginia, it is true, did not entirely destroy her replevin system, until 1795. But she did not continue it undisturbed; for Judge Tucker tells us, that the system fell, “ after a hard struggle for many different sessions.” See 3 Tuck. Black. 422. It is also worthy of remark, that the same author admits that this clause of the -constitution was inserted to operate upon the laws of the several states, interfering between debtor and creditor. Kentucky became a state three years after the adoption of the federal constitution, and in less than eight months after her first existence, she destroyed her replevin system on future contracts. See 1 Litt. L. K. 137. This system was not revived until 1799. See 2 Litt. L. K. 334. So that the first seven years of the existence of Kentucky were passed in obedience to this construction of the constitution.
We are also told, that very soon after the state of Rhode-Island adopted the federal constitution, Chief Justice Jav, during perhaps his first circuit, decided against a law of that state, which granted a debtor an indulgence for a certain number of years, against the payment of his debts, and declared it an infraction of this clause; and from that time such applications to the legislature ceased. 4 Wheat. 137. We may also here-addjh.e construction of Ramsay, the historian, as well as his*'testimony to the effect of this clause. In the 24tbr 25th and 26th pages of the third volume of his History of the United States, he decisively gives to the clause in question the construction now contended for, and records the fact, that it was contended at its adoption, that this restraint ought to be imposed on the legislatures of the different states; that is, to prevent then-interference. That such was the effect of the constitution upon the several states, and that it did restore public and private confidence, is also attested by Fisher Ames, in his same eloquent eulogy of Washington before quoted.
*79- To this collection of authority may now be added *thos#of a more modern date. During tálate war,-the legislature of North-Caro.lina passed a latv.suspending the execution of -judgments for a limited period, upon the débtor’s giving bond and security to pay the debt; and the supreme court of that state decided this law unconstitutional and void. Such have been the recent decisions of the supreme courts of Tennessee and Missouri; and, it may be added, such is strongly intimated as the opinion of' the supreme court of the United Stktes, in- the case before cite-d, of Sturges vs. Crowninshield. The question in that case was the validity of a badkru'pt law'of New-York, which released the debtor on the páyment of part, in case of a general insolvency, from 'the, payment of the residue. The counsel contended, that the clause now in question did not embrace such a case, but was intended to operate upon the suspension and instalment laws then in force. The court, in reply to this argument, impliedly, but clearly admits that such was its intention and operation; but decided that it extended further, and precluded the state from releasing part of the demand.
These, with many other opinions of learned and eminent counsel and statesmen, go strongly to corroborate the opinion now given. Indeed, the weight of authority .is' so great, that bold must be the judge, who could stem -the torrent and decide against it. He must say that the convention did not do what they intended, and that the uniform construction and understanding of our best patriots, who adopted it, was mistaken. It was well observed at the bar, that no instance, except of some subordinate tribunals in Kentucky, of a judicial decision otherwise, could be produced. I ha\e attempted to show that such a clause was necessar^feaf its meaning is clear, and that its cotemporaneous-con-struetion was uniform at that day, both by the statesman, the historian, and the judge, and shall now attend to some of the arguments and objections urged against it at the bar.
, It has been insisted, that a judgment extinguishes a contract, as was decided by the court of King’s Bench, in Biddleson vs. Whytel, 3 Burr. 1548, and of course no modification of remedy after judgment, could be saiefto, impair the contract. This is applying technical lpgic to defeat a constitutional provision. If it was sohnd', it *80would inevitably overturn the decision of the supreme court in the ¡case of-Sturges vs. Crowninshield; for if a judgment upon a contract extinguishes it, in the sense contended for, then the legislature of every state is at liberty to release every contract, after it is once'ascertained and defined by judgment. It is evident, that the decision in that case means no more than that after judgment is once obtained on a contract, no new action can be brought on the same contract. The plaintiff must proceed on and by his judgment, and not be allowed to maintain divers suits for the same cause.pf action. In other words, he liad one remedy, and no «©re, to enforce the same contract, and when this was exhausted, the contract might be said, in this sense, to be extinguished. But it would be preposterous, to contend that a contract, in other respects, is not equally, if not more forcible after judgment, than before.
It has been urged, that every government ought to be at liberty to legislate suitably to the exigencies and manners of the citizens composing it; that this restraint on the states prevents this course of legislation, and therefore could not have been intended; and, therefore, such construction, restraining the states, ought not to be adopted, indeed, it has been urged, that if such is the meaning of this clause of the constitution, it was silently and surreptitiously obtained from the states, and can never be borne by them. To this I reply, that if the clause in question shall be found injurious to the states, the constitution points out the remedy by peaceable amendment, when experience evinces the necessity. But I have yet to learn, that it is essential to the well-being-of society, to interfere with, and impair private rights, acquired by legitimate contracts, or that suc|pi>ractice will conduce to the happiness of the republic. This clause wras not passed in silence, as we nave already seen. It was understood and explained by the ablest advocates of the constitution, before its final adoption, and was the offspring of a conviction, then impressed uponjhe minds of the people by experience, that such a course oflegislation would mar the harmony of the confederation, and blot out both private and public confidence from the minds of the citizens.
It has been urged, that this court ought not to pioneer the way, in surrendering the rights of the state; that thé supreme court, or the government of the nation. *81Ought to claim this restriction, before we-surrender 'ft; and-that it rathér'behoves this court' to sfaná in the gap áhd resist the encroachrhents’of'the federal judiciary, which ale likely to absorb'state powers; If-woiild have' Seen more pleasant, to have met this questfori'af-ter it had been decided' by the supreme court, as it is'' one íffeásurably of a national character.'•' But as we meet it first, we'múst decide it. Wo motive can'exist with any member of this bench, to surrender state rights.; cannot wound 'my conscience, or1 suppress my fix-effiEonvictions, for fear the supreme eourt may go top faW" ' Besides, the government of the Union is not foreign; it belongs to the people of the nation; to us, as part', and the- oath of office imposed on evérj judge; bin'ds hifn to support thafconsütuiion, and that in turn expressly charges' him to disregard any arid every thing in the laws or constitution of his state, which contrsi-vénes.that constitution. Although there, are some decisions of the supreme court which I could'wish were otherwise, yet I do not perceive the dangers of encroachment and usurpation, so loudly sounded; and un-tihldo, I-cannot be foremost in volunteering in opposition 'tó a government, the' most happy and just known to the world. Besides, I cannot conceive that this question is untouched by the supreme court. The clause in question has often been before that tribunal, and no case directly in point has been decided by it; but the principles already adopted by that court, when carried out, lead directly to the conclusion now contended for. Of course 1 do not consider the question as new, or that rights are surrendered by this determination, which have never been claimed.
A long and continued system of legislation oa subject, has been pressed upon the court as tf<|g proof that the law in question is constitutional; has been urged, that the practice of interfering betwsbil debtor and creditor, has been long sanctioned and acquiesced in by every department of the national government, arid this authority ought to conclude thequestion. It is readily admitted, that an exposition of the constitution deliberately established by successive legislative acts, ought not to be lightly disregarded, and that it affords a precédent of high authority. EvéVy time a court is required to decide on the validity- of aff ]^w when tested by the constitution, the delicacy ¿rid *82importance of the question must be deeply felt, and all judges must-wish for relief from so unpleasant a duty; but still it is not admitted that legislative sanction, however frequently given, is conclusive. If so, no system of usurpation which arose and grew by legislative1 aberrations, could ever be resisted. In this case, however, the-legislative sanction is not so strong as has been' contended. It is true, Virginia did introduce and retain it from the year 1748. This she had a right to do, until 1789; for her own constitution imposed no restrictions on her legislative power in this respect. Of coül’se her practice proves nothing, until that period, and"‘after that she soon questioned the practice, and the system fell. - Kentucky, as we have seen, for seven year? abandoned the system; and 'since she resumed it in 1799, the longest period of acquiescence in the practice under the constitution of the Union, is afforded. . Still, however, it has been a bare acquiescence. , The replevin for three months has been so short, that all chose rather to bear than to question it; and longer re-plevin, until of recent days, has been temporary only. ‘As to the approbation of this practice among the states by the different departments of the United States’ government, the instances are not clear and unequivocal. It is true, at different periods, congress have passed laws adopting for the federal courts the execution Jaws of the respective states, as a guide to the national courts. It is, however, equally true, that that body has ever viewed the subject of a general execution law for fhe federal courts of original jurisdiction, as one of great delicacy. Even the influence of General Washington, who more than once pressed that subject upon themjn his messages, as will be seen by examining the ,Sfib1J|poIume of Slate Papers, could not prevail upon íh.énji to adopt a general and uniform system. They ehefee rather to temporise with the subject, and to adopt temporary provisions incorporating the stale codes. ' In one of these acts, it is true, reference is made to valuation dr appraisement laws, now vulgarly styled property laws. This act, however, was temporary only, anfl the kind of property law's then adopted were rather submitted to, than sanctioned. As to the federal judiciary, their sanction is still wanting. It is true, a silent practice in the federal courts of this country, fluctuating w.fth the state code, has been shown, and one decision *83of the federal circuit cpurt |iaa Been prodded, approving of the practice of rej^^ip; but this'decision has since beea.questioncd'byjth'e .sácne tribunal, .'and on a division of that courLthd question has Reeh adjourned to the supreme' courK*. -7*
'Vityas.also been contended, that either th.e |a'w under yrh’ichihe contract was made, must govern the rerq^dy, until it be effectuated, or that the cTause id' question, prohibits all interference with the remedy, ininpitiqn ' tc^ny contract made either befóte or..after the making contract, if this clause is to have qny. effect upon ■the legislation of the states on this subject, If the. for-'mef-fnis insisted that there is, and has beerÁch a constant-succession óf numerous contracts, thatfiie agpe,a.r-ejfnéeof each i’n„ court must resuscitate from the tpipb,. the peculiar remedy under which it was made; that the, executive officers must ‘be made conversant with nu.t; njefou-s laws long repealed, or have their directions given..them on each execution; and more than all, con-,, tracts"made abroad, or in other states, must also intro-ducé with’them their peculiar remedies, and thus various foreign laws must be here introduced without our consent. ‘ If the latter is tlie effect of'the construction contended for, it is urged, that as the states have the power of granting remedy, without which there would be obne, and also of repealing ad libitum, that of course it will follow that those who seek to enforce contracts, must take such as is offered by the state, with as many gears’ replevin as each state shall choose to impose, or-be driven to the alternative of no law at pil to enforce any contract, and of course the clause in question 'can-'nbt operate as is now alleged; or if the suspension law, now questioned, shall be decided ünconstitutiotíMg[i¡iafe remedy will be found, whereby the débt can be ew§|§|? ed, the old one being repealed.
This argument presents the greatest difficulty in the contest, and its solution requires more strict attention.' if every contract is to carry along with it thd .p.^ticq--lar remedy under which it was made, and officers holding executions should be boundi'to notice all, it woujd., not militate against the construction now given.’ The inconvenience or evil, if any, would? not arise frorj» Üió provision in question, and could npt bq.jtttnbute'd constitution, but to the numerous Cjhang'es in legi^qUon-adopted by the stale with regard to executions,_ '"" *84are not spjnatíyih number here, and will not be presumed numerous In a futurp.day. But if they were numerous, .the evil would bé.'occasioned'by frequent and unnecessary legislatim subsequent-'to th.e constitution, which coqld not alteffits meaning or vary its construction. As to contracts made in other countries, it was knp\yn to the convention that they must be collected by the remedial laws of the state where the suit was ■ brought,; and it was to secure to them a facile and speedy remedy, that the clause in question was adopted. To suppose that they would find a remedy in the state to which they pursued the debtor, which delayed-their rec^efy until their value was léssened, would be supposing' that some of the states, where suit was brpught, would violate the constitution, which could not be presumed.
But { need not take up more time in answering the inconveniences and absurdities resulting from resuscitating, with the appearance of every contract, the remedy under which it was made; for it will be seen that 1 do not adopt the. construction of the constitution, that obligation means remedy only, and that the remedy under which a contract was made, attaches to, and so incorporates-itsclf with it, that the same remedy must be used to enforce it. In this respect, I differ in opinion from my brethren, though I concur in the judgments just rendered, so far as they go. I conceive that it was the design of the clause in question, to establish a national principle, and to impose an obligation upon all' the states to give free course to the coercion of contracts, whether.past, present, or future. It was known, that one state, by imposing restraints on either right or rem-¿■gdy^might shut up its doors to commerce, exclude other . 'states and other countries from their traffic, and relying ontits own resources, or feeling the effects of pressure or irritation, might thus place itself in a state of embargo, until alienation of feeling and indisposition to com-merefal intercourse, might excite civil hostility or foreign war; and to prevent this, was the design, and it could not he effectuated, unless all contracts were embraced. f, therefore, conceive that the clause in ques-ifc-jpn embraces all laws touching either right or remedy, •,vf!iich render contracts, legal in their origin, of less value,, whether they operate upon those made before, or those made after its passage. Laws impairing the oh-*85ligation ofcan-tracts are forbidden, without discrimina-ring-" between their retros.p&ctive or prospective operation. T.% question is-, bdlljffiey bear on the forbidden subject? ‘ It may even bé'plausibly’ asserted, that remedy does not dependiHolely on ||e legislation of the states; It existed at. common law, which wat embra-e.ed, >in this respect, by all the states; and if may’be insisted that íliis clause of the constitution has the effect of a national engagement, or compact, that it'shjÉl nev-^. er cease. Rut, without being understood as expressing ’ apy opinion on this, point, or yet as deciding that courts op sheriffs would be at liberty to resort to the ’most reasonable and convenient antecedent remedies, still I .contend’ that there would be no difficulty .^fexecuting judgments on contracts, under the law now in question. Wffer all the delays directed by it are over, then, by the game law,’'the execution, seizure and sale are directed, without further stay. There is .at last an end, when the.judgment must be executed. This- part of the act •#is not unconstitutional. What part, then, is? I answer, that part which directs the positive slay, without the consent of the plaintiff, between judgment and.this final execution.' This part the officer ought to disregard. The act, by permitting the execution finally to go, after so long procrastination succeeding the judgment, tacitly, but strongly admits that .this delay is not necessary .for the purpose of making the money, but barely to give a respite to the debtor, contrary to, and to the injury'of his contract. Let this be expunged from the act, and let the officer proceed with the first execution as he is directed to do with the last, and he will then have complete remedy, disregarding all that is unconstitutional in the act.
It has been insisted that time must be, and is%i veil, between the commencement of suit and judgment'f'Between judgment and the emanation of execution^and then from that emanation to the return day; that these times are left to the judgment of ¡he legislature, and may be protracted by them at pleasure. For instance, intervals between the terms of courts,-may be extended ;• suits may bé directed to be tried one^or more terms after the return of original pro</Jbs; ‘psecutions may-Te fixed to longer returns; that in commercial’ ci‘ti^|Sie sound of the auctioneer’s bell or may be sh^ffent to conyokq the bidders in an iumr, whiler inf s *86population, in a new country, weeks may be required to §'ve su®c^ent notice; thayhese times mustbe fixed as long and short as the legislature pleases, iM-eed may be extended as^Iong as a replevip law, and, therefore, the legislature-may take the sarro time by a replevin law at once. To this it may be replied, that the time given'before judgment, is for the purpose of deliberation and preparation; and the time after judgment, for reasonable allowance to executive officers, to perform their duty. Long enough for these purposes is neces-. sary; longer would be an abuse of power, which might indirectly infringe the constitution, and this might possibly happen without-any adequate remedy, coming from'a cowrt;- for courts do not and cannot push the wheels of government along, when they make an unconstitutional stop, but only refuse to execute the laws, when they direct unconstitutional acts to he done. But will it thence follow, that because the states can violate the constitution without redress, that, therefore, the violation does not exist? Certainly not. The violation” would be as palpable without remedy as with it. It is true, it might be difficult to decide how many days given between the emanation and return of the execution, would or would not be an infraction of the constitution; but still this requisite nicety, would not prove that there could not be an infraction in the longest number of days. possible. We do not doubt the existence of light at noon-day, or darkness at midnight, and that one is clear-, ly and palpably distinguishable from the other; but still, when we watch the transitions of the- 'twilight, we are puzzled to draw the demarcation between them. It will be sufficient to determine these perplexing ques-. tions when they occur. Here they do not present themshlves. We have the deliberate judgment of the. legislature, unaltered for thirty years, that not less than, thirty nor more than ninety days, at the election, of the plaintiff, is long enough for the existence of the execution. .Whatever, then, is added by way of suspending the execution altogether, to the prejudice of the contract, is clearly proved by the law itself to be relief, and not remedy; and-it cannot puzzle any ordinary capacity, to see the diffefene'e1' between the two, more than it does to dispern the difference between light and darfy *87§ si* s-§ s i s 3; i4.-o.rl 2 srS-SM &-S 'a .. w _ . 1 o ct> a> 3 < s-*s ® m °~g §»* IIU" s S ►3 B ET"1-# ^ “*■ 1 — ’ * 3 s^s-g; IN » 3 § o eg | 3 r.■ „ s tr 2. o _ a a <i- EL „ tf- 'S 2 s. B Sb.3°b § Sj ^g'oag-i^'ogo'g 2 & g t" rlrs- ^cr.^s-ol^Sog-,Si3t?l-slrfSI«^E.SBg'»a c/1 o I — I a -‡. £l O " B» 2 .12,1.5 - <D 3 $ STCC £ “i ^ rt- 2J «J Cl P-"* « W cl 34 Sig cd a 'B o L, te <3 -O P:g O u o O o ■ £ ^ .2 t ° g p « _ 'S'!o 3 g^ § §•8 - e o • co j®. !‡£| 34 JT Ü‘» 3 g'S'-p cn i-k* «-*-í 5*- CD (b p w c <■**■ W n £— tr.9,0 S 2 o « a» H.o o T3 a> — q i-gcrcg*® ® 04 o cP a.cw. o- o-g r-t- —, . a) S-X Í^hQ. D r-KCD »T _. CD-. O ü P G 75 C_H T3 75 C O CD <-»»-. e-* £3 i»P ^ S’S.gS g i § 3 <-<- 5 ^ ~ “ w ^ CD w rj- ££. co 7T P oS.fflr.o ,3 00auf.i o ¿3 s: 5 b b o. o < *B. W O..B ^ * g-1 - 2 I — < OrO O <V h9 5 W g 3 ^ 3 & ir T 9k » cr 71 CD fg B“ G' CD «• *3-0* ““ ? CD O - p ;S. M4.£a, 5- S w cd" o 5 <“ 3-5.® S<8 a !»§,» g\ p 15 ! ^ “ §• g i* -:,r B “ B g. 3 g4 g- 5> 55- o. B C 3 2. " Cu cd o. a PÍ- 3 ,ir* a PP co ¡3" -tn tf C8 rt>^< ll c ^ CD -•an o £•, Q CD O I ^
The following petition for re-hearing, was presented, in both the preceding cases, by George M. Bibb, Ésq*
' In this opinion of the court, the meaning of the words in the federal constitution, “no state shall pass any ex post facto law, or law impairing the obligation of contracts,” is discussed.
Although this subject was elaborately argued at the bar, and the Judges have delivered their opinions seriously, and separately, I hope to find an apology with ■the court, assulficientas it is m my own mind, for mov-" ing a re-consideration.
The following positions are, in substance and effect," taken by the court:
1st. That the prohibition alludes to the civil, and not the natural and moral obligation of contracts.
2d. That right and remedy ar.e the same thing, with- - out distinction, and that’ the want of rjamedy is the want of right. ' *P^‘ ■ . -
. 3d., That the legal and civil- obligation of a contract,' consists in the remedy allowed b^aw for breach,
*884th. “ It is th'e rémedy allowed by law in force at the date of the contract, being that on the faitbipf vgjiieh fhe contract was made, which'.cbnstitutes its obljjpition.”
5th. That ;üaw made after the d4te of thex'ontract, which gives ff'Snóre jspe'edy and*|fefficacious remedy to the creditor, is not prohibited; but if the remedy be made more'favorable to the debtor, the law is void.
6th. That the law in question in relation to executions,^ void or not void, at the election of the creditor, although contrary to the constitution of the United States; but is obligatory upon the debtor and securities in the replevin bond, and can, at the election of the creditor, give to replevin bonds the force of judgments.
7th. That the laws of the states and of the United States, adopting the execution laws of the several states, and the execution of the laws modifying remedies ever since the year 1789, are not evidence of the-true construction and meaning of the constitution.
The abridgment of the powers of legislation, notonly of this state, but of all the states; the effect of such abridgement of legislative power upon the states; the reaction upon the federal government; the restrictions upon the power of the people to consult their happiness, and provide, by the accustomed and ordinary'acts of legislation, for the exigencies of war, famine, pestilence and other cases of extraordinary scarcity and distress, are pregnant consequences of the construction of the constitution contained in those opinions, should such construction prevail.
That a consolidated government over a very extended territory, cannot be established upon the principles of a free republic, or if so established inform, will soon degenerate in fact into'monarchy or tyranny, is an opin--ion advanced by most political writers. The .present condition of the governments of the earth, and the hisr tory of all former governments, furnish alarming proofs to sustain that opinion. The division of power between the state governments and the federal government, is an experiment of these United States, to profit by’ the examples of all former.governments, to avoid their catastrophe. That a consolidated government over so vast a territory that'of the United States, would long remain a free republic, I do not believe. The subjects of legislation would too diversified and complex, to be understood and provided for securely, by one legis-*89c-The &ersRj of‘Soil, climate a.nd'prod,uetrJips, fta&M •ajtftgég^ssHies,- would require a diíF^réríce dflK^isEMg^pi&yis'lon adapted to the comfort and con-pacts. A,single legislature woul'd find ftjiimpfictic.ab!e to lagislatq fife the vile, otherwise tliá'ft^oeüfe.rr^g rfulliplied? and uncontrollable dis-creMS'fíary powers on the executive departments. I ■firmly .believe, that the loss of the internal powers ofthe átífte governments, will substantially convert the feder-|;l,;-into a consolidated government; that liberty will hot íq-fig-. survive, exceptan name, such’ con's®! idatign. §^ailwe,pyofit by the mass of facts which history pre-sésts.jia}'ish,ít our eyes against the light of experience 1 .glial} we demolish the watch-tojvers, dis-^^'.^•'|g’htinels, open the gates to the enemy, and hpg-phantom of liberty, sleep in fancied security? ifjbfese te^ming'subjects I do not propose now to discuss, ..HPtoy are Beyond my powers — far beyond the limits of ■^e-tition. , But I have suggested them for the consideration,-of the court. They are, in my estimation,’suf-ficíent ofthémselves, to induce are-consideration ofthe opinions delivered.
’’"Tixe constitution of Kentucky contains, in substance, the-provision of the constitution of the United States in relation to coniracts. The stale constitution omits the word “ obligation.” The particulár phrase of the constitution of the United States, under consideration, is thus: “No slate shall pass any ex post facto law, or law impairing the obligation of contracts.”
Retrospective or retroactive laws are not prohibited by. this clause, unless they are to make that a criine, which was not so when the fact was committed, or an•nex a more grievous penalty, or unless the obligation of contracts is impaired. Bull vs. Calder, Dallas, p. 386.* *90Obligation? other than those-!4rising out of-'contracts, are not within the purview of this profi'lfeitofty-' clause. The constitution of the Uhited States inté^®" by'ifhis provision to regulate the comity and interi^rs-ei; 'th'&fc only between^e several states,-hut also befwoSh the states and foreign nations; to establish the inviolability of contracts, wheresoever made. Contracts -made in Kentucky or in Pennsylvania, in New-York, Massachusetts or Maryland, in France or in England, in Europe, Asia, Africa or America, when sought to be enforced in the States, are all protected by the constitution of the United States. The principle thus inserted in the constitution, was not newly cre'áted; it was an'universal rule of ethics, pre-existing, intrinsically just, and proper to be observed by all legislators; and being so just,'it was therefore engrafted into the federal constitution.
The universality of the contracts embraced by this provision, imposes a high and solemn duty to search the true and proper signification of the expression, M obligation of contracts.” The intention to provide by the constitution a rule of social intercourse between the states, and of comity and civility between the United States and foreign nations, authorises us to consult the opinions of the judges of other states* and of eminent jurists and writers upon the laws of nature and of nations.
I. The proposition assumed by the court, is, that the prohibition in the constitution of the United States refers to the civil, and not to the natural and moral obligation.
Pothier, to whom reference is given in the opinion delivered, certainly divides obligations generally, (not obligations of contracts,) into those which are — 1st, Natural and civil; 2d, those which are civil only; 3d, those which are natural only.
He says, a natural obligation “ is that which in honof and in conscience binds him who contracted it, to the performance of it.”
*91cipl o'b|ightkwi-4s a-bond of .¿n^?yvhi^wiv4es to party,to whom it is contracted, t>y4'aw the performance of it.”
' ¡“’'ObhfatioiS are-rconrrafor^tóboth neural and civil. There are someJiowever, which are merely civil gations, witbout*being also, natural, to the performance &{ which the debtor may be constrained by ,lpw, ah though they are-not binding in conscience. Such is the-obligation which results from.a judgment erroneous in fact onin law, when the time within which it might have-been-reversed, is past;, or from an unjust judgment from-whjch th-éjjé is no appeal.% The decisory oath produces a.l-ike.(civil), obligation. The defendant who has deferred i,t' todhe plaintiff, is bound by this- to pay what,is. thus-sworn to be due, although in truth and in c'bh-•science he does not owe it.” Evans’ Pothier,, book 2, chap.:íl,.p. 107-8, n. 174.
„ Such is Pothi.er’s explanation of the mere cñil obliga ¿iqni Itd-oes not appear to my mind, a proper exposition of the constitution of the United States, to refer its prohibition to tl|§,mere-civil obligation. It is unworthy of that instrhment, to suppose that this inhibition to,.the. states was intepded'to secure the. performance of erroneous and unjust judgments, or duties which the defendant in truth and-in conscience does not owe. it i-s more worthy of that instrument, to refer that sentence-to the natural obligation of contracts, “ which in honor and in conscience.fcjinds-him who contracted it, to the performance.” r /
. For it will be seen, by the very definition of a contract given by Pothier, and by all jurists, that Svery contract must have the natural obligation. The v©ry\ definition of a contract, “ includes a concurrence of the will of two persons at least, one of whom makes, and--the other accepts, the promise.” Evans’ Pothier, art. 1,-sec. 2, page 5.
^Natural lavy is the cause, mediately at least, of alb obligations.” Part 1, art. 8, sec.-3, page 7@.
-To arrive at the conclusion, that it is the civil, and, not the natural obligation, which is alluded to by the constitution, the opinion refers to tl$l distinction between perfect and imperfect obligations: and it isf-a's-se-rted-in the opinion, “ that a civil or legal obligation, is-Íijdtófrbíriihated in contradistinction from thatrjefeira/, Wbnperfeet obligation depending on conscience alono/’ *92is, moreover, supposed a contract would fall under ^e denomination of'imperfect obligation, if dte force of remedy was removed. ■'•■ *4 -~&-
With due respect for'^e court, I must be permitted saT’ suc^ propositions are not Recording to the doctrine of Pothier, who is cited, nor according to the opinions of jurists and writers upon natural and political law. Pothier, in his first page, says, “ Obligation has two significations; in its most extensive signification, latosensu, it is synonymous with the term duty, and comprehends imperfect, as well as perfect obligations. We call imperfect obligations, the obligations for which we are accountable to God alone, and which give to no man the right of requiring the performance of them. Such are the duties of charity, of gratitude, of giving alms from our superfluities.” '
in page 2d, he says, “ The term obligation, in a sense more proper and less extensive, comprehends only perfect obligations, which are also called personal engagements, giving to him to whom they are contracted, the rightW requiring the performance oftl^em.”
“Jurists define these obligations,.or personal engagements, a bond of right, binding us to another, to give, to do, or refrain from doing something. Vinculum juris, quo necessitate adstrihgimur alicujus rei solvendceJ'
“ The words, vinculum juris, are applicable to the civil obligation alone.- The mere natural'obligation, which is solius equitaiis vinculum, is also, in a sense less proper, & perfect obligation; for it gives, if not a legal, at least a moral right of requiring the performance of it, while the imperfect obligation does not give even that right.”
“ A contract is a kind of agreement. To know what a contract is, it is previously requisite to know what au agreement is.”
“An agreement, or pact, (for these are synonymous terms,) is the assent of two or more persons to form an engagement between them, or to dissolve or modify one already formed. The kind of agreement which has for its object to form some engagement, is what is called a contract.” Evans’ Pothier, art. 1, sec. 1. page 4.
After stating a difference between the Roman and French law, he says that a contract ought to be defined* “an agreement by which both parties promise recipró^ cally, or only one of them promises and engages to vtlW*',> other, to give, do, or refrain from doing something.”
*93^ "-'***'«*4 CUV ¡¿trKXl^+Tm\J\J WVi CAÍM» WJ . *y *-< * * t w* «i* gfe#Éfcjfc ■ á^4^n|®deíít,j oMásaábna is <%My i e.sf]¿*i'n$¡J«í aod»b¡*-í$¡ééam£ansstiáv!‘S4tas^ima-as hv'dnB>,d.ef«jSDrt*0ff e®4;fciia‘ctf',sa'n<i’ áiáo i rom .tire denmtio.n<oi.1c:dafcráets!;t^ oí#teptau<thors,' (hereinafter given,) .it-r-wi-li :,appear*s«p$f^¿t,,t-hat no contract can,possi]? ly-be’classed ¿mo-qg-SMiv ^¿¿«obligations. .• ¡ , ■ ■■ ■ <■ •>-, . ••,.</*'♦ ífi «i** .MHher-concl that the
„ la-!air»tving'. .MHher-concl usion, that the mr¿^blís*iitíri, Is^-iefén-rédiio |a4he constitution, the ■®jáni«to-'dé<j-fe¡Bé^ that v‘¿‘the¿q4l-igati'oo- -dep^| d ing oh conscience; -iss.obvit • offljs}-j:'be¿hrícl;'j6'h'e.'re^ch of human ieg'islation:íMteis<a,rft i«í»«^B^flíhU>ütft'of'th.e«floral nature of m-hn, f^'jSÉÉL thpyor^'áfejr.é joí civil institutions, and can náitherJflIl? giyen nor taken,away by human laws.” •- ■ 1
s>víE4>'a't'this.inherent attribute, called conscience, cab-nqbbq.’extinguished by human laws, that it belongs to tftl¡femd§|í nature of man, is readily admitted; yet i-t ssSgtíis¿o''me, 'that;.thisinherent faculty'of man, is ductile1.?that its judgme^iiand.perception of right-and wron¿. mayyb.e¿greatly n^'p.roved,, ‘quickened and in-vigoratedy and argain-debased and blunted, by the-aid of-humami-nH' solutions.' Like other faculties of the mind, it may improved, enlightened, directed and fashioned,- within certain -limits, by society and political institutions. The-faculty is inherent;- its perceptions and decisions-depend mainly upon education. Many diyines have ad-' v'anced this doctrine. It is-so explicitly declared1 by-thq-' learned and- pious Bishop Watson, in his answie.n to Thomas Payne’s “ Age of Reason.” We need*only to' look at the different judgments of right and wrong,-' of the-wickedness ©r goodness of the same-actions,- approved or disapproved - by conscience, in the different quarters of the globe, to convince us that political institutions’,'human laws and customs, dp, in a great degree*, influence-the decisions of conscience. Polygamy is as-.much approved by conscience, in those countries whose religious and civil institutions tolerate i-t, ascitis, disapproved by us. ,»■ The follawers-ofthe Crescent corn sclentiously believe-they are doing Mahomet’s servicí^ inv|.ej^ecu-ting the follow'ers of the Cross. Religious' Wpfgjd'esdo retake, the Holy Land, liave been carried fc-reM^feears, at an enormous "ex,pence-of human'1 life. rope, a -Holy Alliance is formed against the right , *94, of self-government.. In the.,United Stateg, very, different Workings of conscience ore td.Ae found ,qri the subject of slavery. And I can well understand^jjnvv;veJ|^ pious men, just and upright in their demngsjieLt tftóm-selves-absolved from alfnatural and qiyilobligation to British creditors, after they had paid into the public treasury, in paper money, the amount of their respective obligations, as authorised by law.
That I may be fully understood upon this subject,.:;f do not mean to say that the prohibition in the constitution is levelled exclusively against impairing the natural obligation of contracts. I am only eombatting the position, that it is levelled exclusively against impairing the cmY obligation. My firm opinion is, that it includes both the natural and civil obligations 6f contracts, when the cause of obligation is rightly understood.
The natural obligation to perform our undertakings,, is the active and moving cause of obligation.^ When that personal engagement between man and man, .formed by mutual consent, which constitute a contract, is not prohibited by the laws of nature, hor'by the municipal law, and is evidenced in the manner allowed R.y the municipal law, it is then a contract obligatory by both natural and civil tie. The civil tie is a consequence of, and accessary to. the natural obligation. The municipal law is passive, the natural law is active, in creating' the obligation of a contract. In civil society, every agreement by which one man is engaged to another, to do or not to do a particular thing, not wicked nor depraved, and in a manner not forbidden nor disallowed by the municipal law, creates an obligation, natural and civil; natural, because it is done in pursuance of a man’s natural liberty to engage and promise to. his fellow-man; civil, because society has not, in that particular, restrained that natural right. Accordingly,, Barbeyrac, in his note on Grotius, page 8, note 5, says,. “ the silence of the legislator sufficiently infers a positive permission of whatever is neither enjoined nor prohibited. Permission is as real an ¿effect of (he law,, taken in its utmost extent, as the strongest and most indispensable obligation.”
If the obligations, natural and civil, which are combined in contracts, be properly understood, it wiltygreaL ly conduce to the right understanding of the clause m *95By*the opinions ' translated, jifegal, tig”/' cB'áin óFthe law.” Mere1 natüral'obligá-Ítlííi, as'^cpiaihgd by Pothier, is mistaken. ’ These mere naturah ‘obij%a$ions are explained by him to b*su¡/ contra ©ta: prohibited by law, or disfavored; as tjie contracts of’married women, infants, usury, gaming; ■•&c. — S ÉHíhier, p. 114 to 117, part 2, chap. 2. They havfe oijfounded imperfect obligations with.contractspftihibit-laws disfavored by the laws of society, and, therefore, ■wanting the civil (Obligation,■ as will be seen by eonsult-log‘Pothier, part-2, page 1,17, and note 197, where he Shys, u we ought not to confound the natural obligations, O'f u^ii'elr we-have spoken in this chapter, with the imi-pe'rfUrá’óbliigat'ionsraentioned in the beginning of this tyeatisW;”, ,apd by these mistakes, have placed the whole force1 of obligation in remedy, by compulsive force in a court-of justice. Necessity is made, judicial enforcing.; action is made, suit in a court of justice, including ex-e'§h;t-ibi|.;
'-'ibet us then enquire, upon the authority of jurists, 1st,: Whether cothpulsive force in a court of justice, is essential to create the civil obligation of a contract? 2d, What is meant by necessity? 3d, Whether action includes execution?
1st. Whether compulsive force is necessary to create the civil obligation of a contract?
1 The United States authorise the heads of departments to make contracts, and they do contract for and on behalf of the government, in the purchase of clothing, provisions, munitions of war, &c. to be paid for ón- delivery, according to written stipulations. Has this contract a civil obligation, or not, on the government? Gro-tiussays, yes; yet it is clear, that no compulsive process of the law, lies against the United States. There is a right to require the performance on their'part, in equity, and by a bond of right; but the requisition to, performance cannot be enforced judicially, Ijy suit in court, or by execution.
. Grotius (book 2, chap. 14, p. 333) says, “ A man may also be said to1 be civilly obliged by his own act, either in this sense, that the obligation arises, not from the mere right of nature, but from the civil-right, or from both; op, in this sense, that an action in the civil law may lie againlfehim. We therefore say, that from the promises *96and cove,na.t$s,';wh,ichia King makes yyith his subject, there .may arise saeh/a-.true an$|peffecL p&Zzgatiyw, as may confer a xight upon him. ■ - <
“ If the King engages himself, not ag^ a, K)B.g, hut as any other person'would' do, the civil laws shall,oblige him. -Bu^ if they be done by him as a King, .the civil laws do-' not affect', him. Nevertheless, an action may aHse from'any of these acts, so far as to declare the right of the creditor;,but no compulsion can follow, on account of the condition of the persons we, are dealing with.”
The reason why the contracts of .the United , States, made in> pursuance of law by their agents* are .binding, is that which I have before endeavored to explain; that contracts recognized and permitted by law, either expressly (as above) or silently and tacitly, which Barbey-rac says, in case of natural persons amounts "to permission, do create civil obligations.
2d. What is meant by necessity, in relation to the obligation of contracts? ‘
This obligation from necessity, is finely illustrated by Burlamaqui, in his Principies of Natural and Political Law, book 1, chap. 6, sec. 9, p. 43: “ When: we mention necessity, it is plain we do not mean a physical; hut amoral necessity, consisting in the impression roadepn us by some particular motives, which determine us to act after a certain manner, and do not permit us to act, rationally, the opposite way. Finding ourselves in these circumstances, we say we are under an obligation of doing or omitting a certain thing; that is, we are determined to doit by solid reasons,and engaged by cogent motives, which, like so many ties, draw our will to that side. It is m this sense, we say we are obliged; for whether we are determined by popular opinion, or whether wre are directed by civilians and ethic writers, we find that the one and the other, make obligation properly consist in a reason, which, being well understood, determines us absolutely to act after a certain manner, preferable to another. Hence, the whole force . of this obligation depends upon the judgment by which we approve or condemn a particular manner of acting. For to approve, is acknowledging we ought to do a thing; and to condemn, is owning that we ought not to doit. Now, ought, and to he obliged, are synonymous terms. We have already hinted at the natural analogy between the proper and the literal sense of the wofd *97‘‘•obliged,’5 and the; figurative signification'&f the-sprite ■term. Obligatidii .properly denotes á ti'e. : A'man obliged, is, therefore, a person who is tied. Such i's the nature o'f primitive and original obligation.”
Grot’ius, (book 1, sec. 9, p. 8,) speakingpf risjj8fa»says, there is also a third sense of the wort) right, aefSrding to lVhich it signifies the same thing as law, when ’tallecí indis largest extent, “as being a rule of moral'action, obliging us to that which is good and commendable.”
3. Does action include execution?
■ Action is defined,- “ a legal demand of one’s right.”
Action is nothing else than uloyale demande de son droit” — lawful demand of one’s right. — Co. Litt 285.
Action is nothing else than the right of prosecuting tó judgment'that which is due to any one.
Action continues only till judgment; execution begins where action ends.--Litt. sec. 504; Co. Litt. fol. 2891
A petition and summons is a legal demand of one’s right, A petition to the government is a legal demand of one’s right. — 3 Black. Com, p. 256.
■ An entry into one’s land, where right of entt-y is given, is a lawful demand of one’s right. Acontinual claim, is’a lawful demand of one’s right. A request personally made by the creditor, of his debtor, for payment, is a Ihwful demand of one’s right.
Now, all these, or any one of them, do not constitute the Obligation, or bond of right. The right existed before it was lawful to make the demand.
■ The definition of the obligation of a contract, aS given by the court, does not seem to be conformable to tjiat of Grotiiis, Burlemaqui, nor of Polhier. The right “ of judicially enforcing the performance of it,” is not requisite. As is seen by the cases of contracts by the government, or of the King, the right in law, to require the performance, to ask the performance, to petition for the performance, to claim in honor and conscience the performance, is’sufficient. Pothier’sdeñniüon and that of Grotius, substantially agree. Rothier says, “ a bond of right, vinculum j,uris, and which gives to the party to whom it is contracted, the right of requiring by tea the performance of it;-not of judicially enforcing the .pe;r-forrhance of if. That is only one of the modes* of legal, oriiawfu! requisition. 1
*‘,*^á¥b,eyrac,-in'his note on Grotius, page '3, notec.16, say When a merchant 'has said his gooddhto'-iBis *98Ring, the King is as tpuch obliged to pay for them, on the terms, añd a-t the lime agreed on, as the meanest • purchaser.”
■ II. The second position is, that right and remedy are the sarpe, without distinction or difference, and where there i's-ho remedy* there is no right.
.III. That the obligation of a contract consistsin the remedy allowed by law for breach of contract.
IV. That “it is the remedy allowed by the law in force at the date of the contract, being that on the faith of which the contract was made, which constitutes its obligation;” that the court is no part of the remedy; but that the execution permitted at (he date of the contract, is a part of the remedy, and of consequence apart of the contract.
These three propositions may be considered together. it is respectfully suggested, that the ctfurt have mistaken effect for cause. Remedy is the effect and consequence of obligation. Obligation is the cause of remedy. A contract, obligatory by its terms upon the parties, nriust have existed before action sued; and the breach of that obligation is the cause of remedy. The action is not the cause of the obligation. If a contract has been made in another country, and is brought here to be enforced, that contract brings with it here, its obligation. If it had no obligation when it came here, it acquired none by being brought here. The obligation is personal; it follows the person every where; it is not local, but transitory. The obligation is the same in every .civilized country, however the remedies allowed in different countries may vary.
In Viner’s Abridgment, title Contract and Agreement, letter A. voi. 6, p. 504, that learned jurist has explained his idea of obligation, and it seems to me, in direct hostility to the positions taken by the court. “ A contract (he says) is an agreement entered into by several persons, inducing an obligation by its own nature; and the obligations arising from contracts are divided and-distinguished according as they are perfected, either by the sole consent of the contractors, or by the intervention or tradition of things, or lastly, by word or writing; and are either ex re, from a thing done; ex verbis, from words; ex Uteris, from writing; ov ex con-sensu,' from consent. But as all obligations cannot be bound up under general and regular names of contracts, *99f'tfee.law alloys some obligationsto pass -under the name ■ ofiquasicontractm,Reíanse they have'some're'Semblance, and are of the nature of contracts.” ■•■-.. . .
- He says, “a-forced agreement of the party is account-' ed t.o be no agreement,-and, therefore,^hVq&p'Tt-will m ,™,. . . ;<ü .peFte:rmlns add violénee». not compel him who did thus agfee,-; agreement; for the law ahhors all force Ibid, page 505. - , *
This shows that obligation must precede the action on it. The. expression, “ inducing an obligation by its nature,” shows that this obligation is perfect, before breach of the contract. Breach, and remedy for-breacb, ® consequences of .-the obligation so superinduced by the? very nature of contract. In the enumeration of the-causes of obligation arising from contracts, “divided and distinguished according-as they are'perfecíéd,” remedy-is not mentioned as any cause of the perfection of the obligation. The obligation must be perfect,-before -the person is hound to perform; and if not perfect, the-iaw will not.compel the-performance.
-, Where there is a want of right, there ever should be-a want of remedy, and we may say, truly and justly, -that the want of right and the want of remedy, are the same thing;' for remedy is the effect and oonsequencetof right. Rut the court have applied the converse ofifeis proposition, and have said that where there is no remedy; there is no right.
In the case of the Commonwealth vs. M’Gowan, 4 Bibb 62, this court declared that a right had existed in •the Commonwealth from the years 1800 and 1801q until the year 1809, without a remedy. These - expressions are tobe found in that opinion: “Although .the right -existed in the Commonwealth agaipst the defendant,-to the money which had been thus improperly drawn from her, yet it was not until 1S09, that the remedy to recover it was. specially given. By that act, (that is, the act,of 1809,) such a remedy is provided. The right .existed before,but without such special remedy.-”-. .And by that opinion, su-ch want of remedy vested- in- any ,on8' . to sue for that right, -until .the act of 1809 gave it, was .one sufficient reason to.prevent the statute of limitations from attaching, although the right vested-im the attaching, although Qsfpmpnwealth from 1801..
tlqjthis sa.me, cas.e, page-'65, it is declared-,rthatf the statute of limitations operates only u-pon -the remedy, in personal actions, and not upon the right.
*100In Graves vs. Graves’ executor, 2 Bibb 208, the couit adjudged,that the statute of limitations does not affect the validity of the contract, but the time of enforcing it; or, in other words, it does «ot.destroy the right, buntwithholds^the remedy.”
The-' cases of Grubbs vs. Harris, 1 Bibb 567, and Rearden vs. Searcy’s heirs, 2 Bibb 202, were decided upon the distinction between right and remedy.
These cases, decided in the court of appeals, had settled the distinction between right and remedy,-as the law of this, court, from 1809.
The'distinction between right and remedy is acknowledged and adjudged in'so many other cases in the United-States, in England and France, and sustained by the opinions of such eminent jurists, that to cite them all, would appear like a pedantic parade of authority. Some of them, however, I beg leave to refer to. ’ .
Dixon’s executors vs. Ramsay’s executors, was decided upon this distinction between right-and remedy. 3 Cranch 319.
In Sturges vs. Crowninshield, 4 Wheaton 200, the supreme court of the United States, in discussing this very sentence of the constitution, say, in the opinion de-Rvered by Chief Justice Marshall, “ the distinction between the obligation of a contract and the remedy given by the legislature to enforce that obligation, has been taken at the bar, and it exists in the nature of things. Without impairing the obligation of the contract, the remedy may certainly be modified as the wisdom of the nation shall direct.”*
Nash vs. Tupper. 1 N. Y. Term Rep. 402, Lodge vs. Phelps, 1 John. Cases 140, and Pearsoll vs. Dwight, 2 Mass. Rep. 88, are all decided upon this very distinction between right and remedy.
That learned author, Hnberus, after stating very clearly that the lex loci is to determine the effect and essence of the obligation, says, that the limitation of the country where suit is brought, and not of the country where the contract is made, must govern; that if a debt- or, resident in Friesland, executes an instrument in *101Holland", before-a>magistrate*which may there entitle híilh'í^an execuliónrbuLQ&t; by, common right, ho execu-tí'o'n csin issue herb; 'but the merits of the " original de-mandmustbe examines^. *“ The reason,is, that ac(s of limitation and-modes of execution, do not |^eloiig¿to essence of thecontract, but to the time andjmanner of bringing suit, which is a distinct thing. Hm est ratio quod prescriplio et- executio non pertinent ad valorem con-tractus, sedad iempus'et modum aclionis, imiiluentke; quce per, se, quasi coniractum separatumque negotium, constitit.” S.ee the whole translation, 3 Dallas 370-3.
'• The ease of Smith vs. Spinola, 2 Johnson 198, was decided upon this-distinction between right and remedy, between the obligation of a contract and the mode of redress for’a breach of it. Spinola, of the island of Madeira, made a contract there with a subject of the King of Portugal. By the laws of Portugal, in force in Madeira, the body of the debtor could not b‘e arrested; the only remedy there, was against^the property. Upon this contract, Spinola was arrested and held to bail, in New-York. lie moved to be discharged on common hail, and to have an exmeretur entered on the bail-piece. T|^é court declared that the law of the place applied to tbs£’.„obligption and interpretation of the contract, but that the remedy was to be had according $> the law of New-York, and, therefore, refused to discharge his person.
If the court" desire more authorities on these points, I refer them to Day’s Ed. of Co. Litt. vol. 3, note 44, on sec. 104, and fol. 79 b.; Ord on Usury, note a, p. 32. .
They will find, in the note of Hargrave and Butler, before referred to, all the authorities' arranged under these two heads: 1st, That as to the construction of the contract, the lex loci must govern; 2d, that the'remedy must be according to the lex fori.
• It is stated clearly, by the highest judicial authority, and. by the opinions of the most distinguished jurists and civilians, that the right derived from contract is transitory and follows the person every where, from country to country; but that the remedy must be according to the law of the forum to which application is made, and in conformity to the rules prescribed by the laws of that country. This transitory right is wholly inconsistent with the obligation of p contract, as defined in the ppinion of this court, now under consideration. .The *102natural obligation of contracts must be the same in ev-Gi'y C0UUÜT; it is founded ia-the same natural right to contract. The civil obligation consists only in the want of restraint upon the parlies to make the contract; implies, an assent of the political society to that contract; and, interpreted according to the rules and regulations of the body, politic, is only an accessary to the natural right and obligation. That civil obligation attaches and unites itself at once to the contract. Being the assent of the sovereign power to its validity, that assent which constitutes the civil obligation, likewise follows the person from country to.country. Upon this basis of natural and civil obligation of contracts, it is easy to see, that a contract can have the ¿ame obligation everywhere; that the obligation follows the person from country to country, not being clogged with any particular form of remedy for breach of it. The dissimilarity of the modes of redress by mesne process, judgment and execution, in different countries, has no effect in varying the obligation of Are contract.
Suppose an act of the legislature of one of the United States should declare, that no contract thereafter made in any foreign country, should have any obligation upon„any party to it, if found within the termory of that state; but that he should, upon entering the territory, be forever acquit and discharged; would not such an act be a violation of the constitution of the United States? It seems to me, that it would violate that international principle, which was intended by the constitution of the United States; because the contract, if permitted and acknowledged by the lex loci contractus, had, instanter, an obligation, “ by its own nature,” which, followed the person into the'state; which obligation comes under the protection of the constitution of the United States, secured against annihilation.
■If the remedy existing at the dale of the contract, and allowed by law, constitutes its obligation, “ being that on the faith of which the contract was made,” as asserted in the opinion, that remedy must follow the contract wherever the party goes; it must be as transitory as all jurists say the right derived from the contract k. If this remedy does not, or cannot follow from country to country, then the obligation either ceases when the party goes into another country, or the obligation changes with such change of country; it ceases whilst *103fife debtor is, in', a- des’ert, or it is dead whilst 'he ' is^ onjjjthe -high1''Seas. Again, when he touches the shore,it i¿§es‘, like a Phoenix, from the ashes of theÜead. It: is "like’ the.Gamellón; it is like Proteus; it is like anythingorhiothing.' ■ ,’5-
If the remedy existing at the date, is a part of the contract, then the rule docket must be revived, to suit those* contracts made before the rule docket 'Was abolished; the remedy by appeal and writ of error attaches; the alteration of the limitation for writs of error-, from five-'to three years, can ofily operate upon contracts fnade after the new limitation to writs of error;- and this court'has, in one instance, if not-móre, applied the limitation of three years instead of five. Mesne process isas mucha part of the remedy, as final process.
.By the opinion delivered, the force, which, in a state of nature, might be used by the one party to exact performance of theperfect obligation, constituted the remedy. The party entitled to use force, in a state of nature, could choose his time and manner of exerting that force; he could modify it at his will and pleasure. For this right to us^individual force, the aggregate force of society'is substituted. The individual right to use force, to'íforbear,’ and to modify his ■ force from time to tiim untiTperformance is exacted, is surrendered to society. Howshas the individual acquired the right to deny to society the modification and exertion of their aggregate force, from time to time, according to their wisdom and discretion? When any contract is made, it must be known, that whatever laws then exist, are, by the yery political compact, liable to be changed. One legislature cannot bind their successors.
“ The duration of law, in general, as-well as its firsj establishment, depends on the free will and' pleasure of the sovereign, who cannot reasonably tie' up,his ovfh hands in this respect. As the state of things may happen to alter in such a manner, that the law, grown useless or hurtful, can no longer be put in execution, 1% sovereign can, and ought, in that case, to repeal and abolish it. It would be absurd and pernicious to secjb ety, to.pretend that laws once created, .ojiight tq subsist forever,’let what inconveniency soever arise1.’ '* T3urle% Hiaqni,;bopk l,chap. 10, sec. 14, p. 76. - , ,
*104Such are the doctrines of Burlemaqui, in his cele'* brated disquisition on Natural and 'Political, Law. These'are consequences deduced from that tiénevolence, goodness and wisdom, t<5 provide for the whole, which are Ae true foundation of the powers of government, Chap. 9, p. 63 to 66.
if the individual has surrendered his right to use force, and'ithe sovereign is bound by goodness and wisdom. to alter the laws when they are hurtful, and cannot tie his own hands in this respect, how has the individual acquired the right to tie the .hands of the le'gis-Iature in this respect? The court, say, by the power of contracting, one with another; that by individual contracts, the hands of the legislature are bound up, so that they cannot modify execution laws, from time to time, according to their wisdom, because the remedy existing at the date of the contract is a part of the obligation; right and remedy are one and the same, and no state can pass any law impairing the obligation of contracts.
But Huberus Emerigon, and the most distinguished jurists and civilians of Europe, the courts of Massachusetts, of .New-York, of Kentucky, and the supreme court of the United States, say, the modes of execution form no part of the contract; the distinction betweén right and remedy exists in the nature of things; the remedy may be changed and modified, without impairing the obligation of contracts,
According to the opinion of the court, the civil obligation consists in the remedy. Now, no action can accrue, until breach of contract. Has a contract, then, no civil obligation, until it is broken? If it has, in what does it consist, before breach? Is it the prbmise or ex-pectationfiremedy, incase it be broken? Can or-does the political frame of government of Kentucky, or of the United States, promise that laws shall be perpetual or immutable? Do not the very annual meeting of the legislature, and the constitutional form of government, declare that the laws may be changed annually, or at the will 'of the legislative body, with the assent of the executive? It sqems to,me, that the most-which can be made out of that view of the subject, is, that we must repose a general and salutary confidence in the legislar ture, that some remedy will be provided, modified, •moulded and adapted to the state of things and the changes in human affairs; but that no particular reme-*105«fe is gti|iranteed. Remedy is solely 4i subject of-legis-Mj^-discreti<spmr.-f|,o suppose that a goyfespii^tat tolvi.de r.eme^ies fo.r injuries, is to' supposg;&mdtion-lfíba^)%F,i¡an|. .¿To deny th©-ri^± to modify tfi?»i*ém-edü^Tjrórn-time to t-itne, as experience-and exigencies shall require, is to deny the right tolmprove andlame-liquate, the condition ojLspciety — saps the veryffounda-tio^.and.obstructs the tvery intent of ibe soHal compact, “
. d^he court say, if the legislature can pass a replevin fewrbftwo yearns, they may for one bund red years. To ffe'ny the u$e of power, because i't may.be abused, is not considered a fair argument. Judge Iredell thought tfaat rnode of argument not to be indulged-, in relation io.lqgislative power. His objection to that mode of argument is very clearly, but succinctly and forcibly sin- f ted in the case Qf Calder and wife vs. Bull and wife, 3 Dallas, p. 400. “ We must be content to limit power, where we’can; and where we cannot, consistently with its’use, we must be content to repose a salutary confidence.” .
The legislature might retort the argument of the couyt, and say, if the judges have the power to declare a law void,because they think it unconstitutional, they may put a stop to all legislation that does not accord with their notions of policy. *
’ v,j. The opinion of the court, in effect, asserts, that a law made after the date of a contract, giving a more speedy or more efficacious remedy to the creditor, is npt a violation of the obligation of contracts; but that the replevin law in question is, beeau'se it gives a more tardy reme.dy than that which existed at the date of the contract sued on. _
_ .Tiiis position is the result of the answer -pyerTto the cases of Grubbs vs. Harris, 1 Bibb 567, and Rearden vs. Searcy’s heirs, 2 Bibb 202; and is, moreover, in expniss terms, to be found in the opinion of one of the judges, in the case of Grubbs vs. Harris, the question was upon the right of the creditor to sue his debtor by petition and summons, upon an obligation entered into before -the passage of -an act of assembly giving that summary and more expeditious remedy. The court, consisting of Judges Bibb, Boyle and Wallace, sustained the remedy, These reasons are given by the court: “The statute does not change the essence of the contract; if *106is th§ modeof-reco'l^ery which is changed. If the prop* er distinction is observed, between..* tho$p.-laws which have reference to the essence; nature', construction &r a . extent?of a contract, apd those whi’th have Téje-renoe only to-the mode of enforcing them, the' quhsudti'wiil be plain.”
“ The, lex temporis contractus must be regarded, in giving a decision upon the- essenfife and'nature of a contract; th^fews existing at the time of seeking to enforce the contract, must govern and dete.rmine the kind of suit which may be brought. The means afforded by the laws for enforcing a contract, in case of breach or non-compliance, make no part of the contract. If the partie^to the contract act in good faith, they intend to perform the stipulations, and therefore cannot be supposed to have stipulated for dilatory prodeedings in a suit for enforcing the contract. That personal contracts, which were just and lawful when entered into, according to the laws of the land where they were made, may be enforced, according to the true intent and meaning of them, notwithstanding a change of residence.of the debtor, into a country whose judicial forms of proceeding are peculiar and dissimilar to those prevailing or allowed, according to the lex loci xontr actus, is a principle of justice, as' well as of social policy, which has ever prevailed amongst civilized nations. It is no plea for the debtor, to say the contract cannot be enforced by the same form of law that prevailed in the country wherein he contracted. The reason is, the modes of bringing suits and of execution, are distinct from, and make no part of the contract itself. They do not enter into the essence of the contract. So, the forms of suit and execution in our own country, at this" time or at that, make no part of the contract, at the one time or the other; and the legislature are at liberty to adopt this or that mode of enforcing contracts, which ihe'oirctimstances of the country may suggest as expedient. They are not bound to continue the same forms, and same system of courts and of proceedings in suits, for the accommodation of debtors or ceditors.”
These principles accord with those expressed by the courts of Massachusetts, New-York, of the supreme court of the United States; and of Huberus, before cited, and are fortified by many decisions in England.
*107'Jri'Reardm vs/StiSam/h heirs, latid, was^soHxincler ex-BtéfjJ-'ffrefeíb, which-’made the distinction Between .contracts before and aTtey tpe 17tbT)ecemb.er 1792..’, ’This c salé was\.d'ecjared' va'lM,i The coarL composed of -¡i J‘tí%es Boyie, Wa'llácIjFand Clark,' Mcla&.ra that opinion, that the act of^í 792, subjectingTandsteexecu-trbh'for'debts befó,re contacted, was not unconstitutional. The'-reasons are thus ^expressed-: “It is certainly, a well settled rule, that’theyaw at’the time a con-trSctHs made, cbmposes"a part of the contract, so far as-relates to the nature and construction of such contract; bufít is equállyruell settled, that the remedy to enforce such’'contract must be according to the'law in fored^úí thedimb such remedy is sought. Contracts, are not made with'an eye to the laws' that shall enforce them, or to ¿yvliat property shall or shall not be liable to execution; DufViith'an éxpeetation of each party’s performing,' with good faith, what he has stipulated to do.”
-In Graves vs. Graves' executor, 2 Bibb 208, it appeared: by the pleadings, that both parties lived in the stale of Virginia when the contract sued on was made, and.' continued to reside in that state more than fiye yearg; after the-contract fell due; whereupon’ it became a <¡i?é$tioñ,, whether the Virginia statute of limitations, or that of Kentucky, should be applied. The court declared, that the-limitation of Virginia did not apply, but that of Kentucky. In coming to that conclusion, they say, “ With respect to the nature and construction of contracts, and the rights and obligations of parties, arising out of them,, the principle is well settled, that the 'la'w of the-place where the contracts-weré made, is to govern; but with, regard to the remedy, the law of the country where the contract is sougbt’to be enforce^ ou-ght'to be'the rule of decision.”
I beseech the court to consider whether these three-decisions, by this court, so solemnly asserting and reasserting that those rules were well settled, pronounced in times when the surface of society was smooth; when the'political, bark was unagitated; when there was no rage of, conflicting elements to drive reason from the . helm, were not competent, of themselves, to settle these-rules?' Whether they ought not to be considered mainstays in the exercise, of your judicial oisc-relioH? I en*108treat you to examine, the opinions of' other-judges and jur‘s*-s referred to, and say whether those rules, scas-serted in those three ©"pinions, were'not, anS^ace not wrell settled by the concurrent opinions of distiii’gui'sh-jur‘s*:s in Europe and America? How do those rules, so settled, comport with tire positions now asserted inU'he decision under consideration,that right and remedy are the same thing;'1 that the remedy at the date of the contract, is a part'of Us obligation; that men contract on the faith of existing remedy; that the legislature cannot modify fhe remedy of execution, and apply such modification to pre-existing contracts”?
In the opinions under consideration, the rules ass'erled in those former opinions are overturned and swept away by the passing remarks, that the petition and summons law was an additional remedy, and the act subjecting lands to the payment of debts before contracted, was a more efficacious remedy; “and on the supposition that the obligation of a contract consists in the remedy, it is most manifest, that neither of these acts could impair that obligation.” “ Whatever may be said of the reasoning of the court in the opinions delivered in those cases, (Grubbs vs. Lipscomb and Rearden vs. Searcy's heirs,) the decisions are evidently correct, and perfectly consistent with the idea, that the obligation of a contract consists in the remedy allowed by law to enforce it.”
In the opini-on delivered by the second Judge, it is directly declared, that the petition and summons law, and lav/ subjecting lands to the payment of debts before contracted, did not impair the obligation, because the change produced in the remedy by each of those acts, was not less tardy nor less beneficial to the plaintiff, than the pre-existing remedy; “ and it is impossible to perceive how the obligation of contracts can be impaired by either accelerating the remedy, or by making a fund subject to their satisfaction, which was not so when the contracts were made.?’ But in the cases of Blair and Williams, and Lapslcy and Brashears, the law is void, because the remedy is more favorable to the debtor.
The base and foundation of the decisions under- consideration, is, that the remedy existing at the date of the contract, “ being that on the faith of which the contract was made,” constitutes its obligation; “ the legal obligation of contracts consists in the remedy which the law *109«af$>rd£jb. t%fa|‘rtbe-wa^l; ,of,ng^.tSiand the wantpf réjate-M/^re-4f samb:ftW.i^t-^ ‘ •
Tí^T^'iWp^iPji.is.^o weaken,,do"g^ur^'ito destroy. .The. *".decmoñ.-^eF^,?that the rertjeuy e^taling'at" the date of ‘fb'e.coirtrg&t^máyAfiiciesírQí/flí/, prpylded another remé-i<Iy5’^orev-bene-fici-gn^pfecly and erftpacious, J;o tn,e;ofea-■'%í 4 Rlainfiff, 'is.gj.yiíPf' but-i? the sJe^ Ce^d^p'^R" *.sted' to, be suhstittp^d'by the destruction qiíiifeS old,; is -inpi;e tardy.or favorable jto 4the debtor, it impairs the, é}>-•¿l'kjnljion of the, contract,. and the law is void. Thus,'the .constitution protects creditors; but not debtors!!!' Is such afconstructiop the tru.e one? The proposition is c’ertainly new, ana never before advanced, by the most strenuous advocate,of this clause in the constitution.*' -'.fljfe.us examine it seriously. Supppse the legislature ’“«•should say, by pfter laws, that debts upon written con,-tracts, expressing- on .¡their face to be payable inope years, shopld be payable in three months; this would certainly, be a more, speedy and beneficial remedy tor •the plaintiff. Suppose they should say, that obligations on their face for twenty dollars, should not be discharged, but by the payment of one hundred dollars; this'also,would be,more beneficial to the creditor; but each more cmerous-ta the debtor. Would not the Obligation of those contracts be violated, impaired, injured, destroyed?' I •. -think they would; because every contract, exvi termini, includes “ a concurrence of the will of two persons" at , least, one of whom makes, and the other accep.ts, ftie promise. Evans’ Pothier, art. 1, sec. 2,-p. 5. ' r
i A contract is a transaction in which éacRpárty comes ..yinder an obligation to the other, and each reciprocally acquires a. right to what is promised by the other.” Tdwell on Contracts, p. 6-7. ,
, A contract is “ an agreement, upon sufficient consideration, t& do, or not to do a particular thing. First, there is an agreement, a mutual bargain or convention.” -2 Black..Com. 442.
If one party promises to pay twenty dollars, for the consideration given by the other, . that other agrees to accept it in satisfaction of the thing sold, &e. he *110agrees to, tie content jyjthjhat sum,.and|itp ’demand n© ^ore. if't3ii%i{jme,of ..payment ,be;fixpd,s“'tbe.Me pitom-ises to pay at. that t.iip%aBd,tbe other promises-tof wait the time agreed. „The$e are the obligatrons'of theone Par^ to theother. This reciprocij^of obligation gtow.s out of, and is essential to every contract. It is essentially necespajy. that each be bound.;- if the one party is bound, aim the otlier not bound, i.t is nqt a contract. Comyn on Contracts, part 1, page 3. .
“ In omnibus rebus qua dominium transferunt, concurtét, apertet, effecius ex utraque parte contrahentium; namsive ea venditio, donatio,. sive conductio, sive qnalibet aim causa contrahendi, fuit, nisi animus utriusque consentit, product ad cjfectum id quod inchoatur, non potest.” Powell on Contracts, p. 8.
It seems clear, then, that the law, in the cases above-stated, would impair the obligation to wait the time, and to accept the sum specified, by which the creditor-Is bound to the debtor. Every bond or note, although signed by the one party only, by the acceptance of the-other party, creates this mutuality and reciprocity of obligation. It is but the evidence of the contract,, and - is the assent of both, or neither is bound. If, then, the remedy existing at the date of the contract, constitutes its obligation, it seems, from the very definition of contract, that it is the mutual assent and agreement of both to abide by it. Each is reciprocally obliged to await and abide its terms; and the rights of the debtor would be as much violated by an after law, giving a more expeditious remedy, or an increase of the obligation, as-the rights and obligation of the creditor would be violated by a more tardy and less efficacious remedy. This construction, s’ecuring the rights of both parties, is. worthy of a constitution which intended to secure equal and impartial justice to all.
VI. That an unconstitutional law is void, or not void, at the election of the creditor; that he may at any time quash a replevin bond taken under it; but that the. debtor and securities are bound by it.
If the law bp void, it is as if it did not exist. The constitution of Kentucky provides and declares, that laws contrary to the bill of rights, or “ contrary to this, constitution,” shall be void. The distinction between void, and voidable, is comprehensible; it is known to. the laws; but how anací can be void, and not void, af *111la .-a g'«> s^4¡gr. Ó ft ,"g-"S,-2 'So !SÍ t-c-* O . 3 tí» ft'STft -CBN a B. 2 O >■ ft. S£<5= Ef < at 0¿.'5±, =v,» V^S? O @--~iK ®«- *-» S.g S' »•§ S-g'Si^g 5 § g: ix ^-SLas? S g?k 5? d g^ck&iStg -§^§- !£*.<&? ® o 5s n>Sr-$^ £->c> p*srf/:3 * ‘CO pj o* *s *2: ...g^iirib. § g; 5 ' * $.* 3 Sfg1? » c •S‘. S'g'-S.s ^< * & 3 Si fijl'.t> 'I so® • 'cO ¿O ,*C5 O 3:#Í8¿€ ^ or- *5 **“■ a* o*o fl>_ ®. p1 3-* éütcfc £L *0* pi ,CQ4 ‘cT <• Ctí __ •w Ojti o ‘O' S5 c3:,>\ M CO l> '^3 U O “ ¿3 Ji-CC^ol P(5 ^ ‘ " CO jí.o a® o .s' 2s»s-«-5^ SvSb'S^ ^^"'aa'rtl p” t^'<£*-. c> »»Cr '■*? && p^s03 2f’S-* ^ v-J G ^ ‘hwA» C4rf G-i'Oi.CB hn> -g ~9 <rjvs «S- o-.-- ’a* :p e-^3- ^ s- P«B. ®2-Cb ♦ — .• ^sJ 3 O' » 57^.- n> f &-■?*“ =*• “ «3. 2 ». = 2fi- á'-.&ñé-ffr-P. ro b | S' § 'O, 'cb- ~ «1 p, x-p W1 •£. Ü ^ ® o M o | tó «
.cr-S» (B- HJ §*§ * _»>o »= rj *** p O P ST^ • - zsu03 <5 p _,. cr^ <X3 £* p 5* 3-. o-err ® sí; P *f o' p g*‘ P 2' cr £$~ cf JF 2. p t*^. ' . . o <•*■ CJ cr cñ <5 o d>: o> o ® O *T SlZ J3 re r~i Kn W pLl > 2 ft -• ft* c a £ 2 2. « s era ° ft* ^ *3 r> 2. <b y* ^ a- rj S3 cr O ~ ‘r- ' p - - . -<j ^-* f — t~ • V». CD O o'Sr'i.< 9) ST b&,:3o o » 5)S ^ l-S o -- P 13 a ^ ft- B S, g.^ ®- -<. cb ® 2 § P o' S' P S ^ S' := ^ 2. ^ w ^ ® 3 g era ►§ ^ « g' 5 s t^:s-rss-ussg-.^l§i cb es; g • § b SL 2. c c& cr cr gr cr ^ cr it B? %• 8- O ? S3?» P» *i" O Vs <? £?<? K* o : cr ST a "¡P O P O * — '• fly P psjJSog C&J ^ v> Ct» ►*^3 S“M ^ ^3 ^ o o 5 G ÍB- Oj OQ „ n ->g:3 2 P jn » S* si H o =r.i 5 ere rf* P - cr • - ® a < - g O' ?-- S3 O 1. 3 O' » p p : cr J*-^ ^ £ ®" m M a, c ~ " ' "‘ “ 5*o n>i-n c „. w.„ g m ®»5qg2. Do.® »-BU2.sa“ g:aq ® 5 !=t3 g" 2. < » 2 - Sigr g? p CO G: CPi cr o cn^ 1_J< ft S' » £ Í S*-® gj td S. s' ®-T3 S?B 2 ft o !T. of ® o ““os n 2 -.. ft o 5 s ft to a £> ca a n- n í» 55* °? o ^ cr 2. 2 oí C a « c 3 O C fS, P • OOG21C cL el p n- pc e frw. ¡3 ^ cr CD p fl, 1-f- r C D. CL O O to _ ^ cr E3 p. CD crs> a. “ j p » «i» si tí'Stíg'g g S’Bft cLp>-jcr cD1-_ícDOa2_<i Cri-p 8 S?« S 2 ^.2 _ Jü ‘r* - w 5 Oi2 r v a » o >i “• a f^s! á S § g §f‘| sf-S liT ’- CTí CD *^■>73 O P 3. P ofl £ c +j 2 s o ra =-• o ^ * c ® ° o ® 2 P Vs o o o a a tí K- a o ft "• o o"B¡' o s B g: s: g <w ¿,g o. g «e. OaqyQ ce ^ -íi ft ft o jt E?a g a * tíS?K.-^g»3S° ' ^ cr.3 rt’ ^ 5. P .ti » to a _ x> ’C 2 03 G G O O O ¡S
--. . P-c p ^ s ^ o a- • o (i ero OCR ja a a co ^ °*S'g S ' § s p; 3 ® ca-*33 ' o X! o P o p ' Ct- *~3 c o X3 o go" 5r? ^ a> CB O ^■as. « jrJ (ti CJ *112and' defendan f by his acts; but the procepdings-under a v@id la%, cannotb,e assimilat^’to that. cash. ■ ^ '
The validity ,.of judgments',' executions anf^replevin bends, depebds uponjthelr conformity to law».' .If the judgrñént is erroneous'and is reversed*, ■ the execution and replevin bond taken under it^fall with’ the judgment. ■ If the execution does not pursue the law, it may be^quasbed and the replevin bond falls with the, execution; fía defendant enters into a replevin' bond,-:he is not thereby precluded'from reversing the judgrne.nfcqr quashing the execution or bond, nor from resortin*|í¿»a court of equity to impeach the merits of the original transaction. — Faughi vs. Byrne, Hard. 330» Trie reason is, judgment, execution and replevin bond, all depend upon their conformity to law, and all proceedings from judgment to replevin bond, are considered as proceedings against the will of the defendant; they are not new contracts. Upon several acts of parliament relating to appeals, gaming and usury, it has been repeatedly decided that judgments are not contracts; judicium reddi-inr in invitum. — Biddleson vs. Whytal, 3 Burr. 1548; Bush vs. Gower, 2 Strange 1043; Middleton vs. Hale, t. Cro. Eliz. 588; Ord on Usury, p. 90; Barjeau vs. Walmsley, 2 Strange 1249. The validity of every re-plevin bond taken by a sheriff, must depend upon the question whether the lazo authorises him to take it. For by the act of 1796,.! Litt. 585, 2 Digest 1137, “every obligation by any sheriff taken in any other manner or form” (than before described in that section) “ by'colour of his office, shall be null and void, except in any special casé, any other obligation is or shall be by law particularly and expressly directed.” If the law then under consideration be unconstitutional and void, the a-ct does not authorise the sheriff to take the replevin bonds, and, therefore, by the express provision of the act above mentioned, those bonds are null and void. The position taken by the one Judge in his opinion, to obviate the confusion which is to arise from- the decision in question, cannot be maintained .upon the principles of law; but all such replevin bonds must be void and not obligatory on any party, if the act be unconstitutional. The case of Barbour vs. Barnett, 1 Litt. 396, cannot, settle such a doctrine. There, no bond was taken by the sheriff; i.t was a sale of land, and the act is not declared to be void. Replevin bonds derive their whole force *113^0m.tBb sta¡tu|e/l.aw, They’'.are bonds.'instituted»',|>y, f|w andmusbsíundqpf f$®j&ydbrce. of positive few., *$ *
Seóc^o^h’e true cáfiftractídti'of tbe constiüitibn, ntí^of Iheim’eknihg of “obligation of contracts.” , L :•
Jjpjlffiactsftpf Congressbave-, adopted the execution ■ l^ra&f theíweraJ statés;;‘they,báv'é''‘í,dtbis day.pr$yid-©mpP^ther.'' The first act, neguíattilígl-prócess in'1 the tíSuñtátof the United States, passed^$E2iíSÍí of September, 1<%9. Thibet of 2d March, ivaBf provided that the Valuers appointed by the laws*of the. states, should bp-,valuers ob'executions issue^} from the courts of the United States, and the marshal was required to sum-moil them.
WitMfat going further for the operation of these acts JfóSbngress, than.to the state of Virginia, it will b© found that in 1787, Virginia passed an act requiring property to sell'for three fourths of its value; that the sheriff was to'summon the valuers; .that if the property would not sell for three fourths of the appraised value in ready motley, the defendant might replevy for twelve*' \ffonthsfhif he would not, the property to'be sold on twelvemonths’ credit. This net continued until 1795, And was adopted by Congress. The rule against impairing the obligation of contracts was right and just, before itwas inserted in the constitution, and it cannot; be,'supposed that Congress intended to violate this sa-créfhrule, appearing in the constitution as a rule of -iSP" But this argument the court attempt to answer oy^iggestiog, that Congress is not restrained, although t'hsstates'are, from impairing obligations; or that Virginia might have supposed the act could only operate upon contracts after made’; or that Congress migftt have given it the same prospective operation. T'
As to the supposition, that the law of Virginia was prospective, (that is, to operate only as to contracts thereafter made,) the act upon its face presides such a supposition.*
*114The Cong,rgss and the President of ,the United States no* been ignotanifeat B<ritisTi debts lo a ye-ry large amounfycon.tVacted by the citizens of Virgjnia andv of oth.er states, before 1776, were to be; collected through' tfie fede.rai-pburts; that this law,of J-787 of-Vir-gima, was made long after those,contracts, ;and th^t those Br.itish debts were to be collected under,tl}e Virginia law, of 1787, as to all those who were sued in the state of Virginia. ... ' f.
Moreover,.itfis well knowti that during Jfre embargo and non-intercotirg6,;l;aws, and during the war, tb^f^Bs passed remedial\.psms suited to the exigencie^gif the times, not prospectively, but to operate on contracts pre-existing.
The state of Kentucky, as well as other states, passed two laws to protect the citizens who were upon military duty, from being subjected to judgment and execution whilst absent in the service of their country. Tit is evident, that the right of the states to apply remedial laws to pre-existing contracts, has been practised upon ever since the adoption of the federal co'nslitution; that ■these laws so regulating the remedies merely, have never been, until recently, adjudged repugnant to the "constitution of the United States; that this exposition has been sanctioned by many of those who ygere the framers of the federal constitution, who were members of Congress when the state laws concerning executions were adopted for the federal courts, and by General Washington, who was’President of the convention who framed the constitution, and President of the United States when the acts of Congress referred to were passed, and were approved by his signature.
“ Whensoever there is any dispute about the sense of what is written, the practice afterwards established, and *115jgús, ttS'és to b&off grea t weight? . WlSidlf is-:áisijffid» be obsHflcL in holy Gro* i;i'u%':bbóli i’^el^i-pl 2/see^, "AVv' •
^^Th&.Tiygmia’co'bvention,' Ga^ñndr Edia>i]d‘ilan-ddratí^^plwás á member of ;lhwfconvention -which "Si-sAV.’.raCiJ‘**V‘ rr- -tík‘ - „ fcr, ■ v-■ . - . L ,#ám^£f^^d(5'nsfi'twi;pn of^the Umted '.States,-declared in 'á^lí^^Ón*this^very tfr-tic.bg of,the c'onstítutiontpro-&i'Bft|W-i‘toJfate legislation,.tyi-th regard -totfetros^e'e-. tiv&T^s, HjBre is nd reatijaintl?’*.^ .fh-• - ,■ - - ¿t-
iOérnsAo follow, irpóti the author- . . , ... »V 1 eminent jurists— :' -
TiláVevery contract which is no'&ufát|bidden by the laws uPaature nor of civil-society, has the natural and SVil obligation, at the yeryjnstant it is.¡mutually assent-'fd!?', ’ r - ’
'That this obligation is the effect of the natural right t'ocontract, so far as th,e laws of society have hot re? ^tfjijnet^ihe natural right:
’^Mát the civil obligation means nothing more than. ’fhat general obligation which every one is under to, abide by the laws of society: ^
"“ That the fulfilling'of covenants and agreements be,to'rigs to the law of nature:
From this foundation civil'laws were derived:”
“ ThS-human nature hers'elf is the mother of natural' 3 áw, wMch' creates in us the-mutual desire of society:
And ihe mother of civil law is that very obligation which arises from'consent; which deriving its force frefm the laws of nature, nature herself is the mother of, nakiral law and the grandmother of civil law. — Grotius’ fjághimínary Dis. sec. 16 and 17.
",?ff?c>o that natural law' is the.fqause mediately of all obi^ation.”rT-Evans’ Pothier, pc7A.
. That -instant a contract is mutually assented to, if-permitted by the laws of nature-,' and; not prohibited or disfavored by the civil law, it acquires, byrtgfikbn nature, an obligation which is person::!, and transitory with the person of the debtor, from country to country; and; _its obligation is the same in every country, however the remedy allowed by the civil institutions of the different-countries may vary; beeduáe the form^of “suit,” and' of “ execution,” in this country or that, and at this time or that, form no part of th‘é obligation of the contract.
Note. — Tho Reporter had intended to have given a catalogue o£ all the reported cases decided in America, in which a legislative-act had been declared unconstitutional, on any ground whatever; but, on reflection, he has concluded that it would be less embarrassing to the reader, to select the cases where the ground oX the decision was, that the act declared void, impaired the obligation of some contract.
1. The first case ho has met with, is Vanbornc’s lessee vs. DorranOe, decided by the circuit court of the United States for the district.of Pennsylvania, at tho spring term 1795, declaring an act al^'asscmbly'' of the state of Pennsylvania, void. 2 Dallas 304. “'
2. The next case is that of Fletcher vs. Peck, decided by the supreme court of the United States, in 1810, declaring an act of as-' sembly of the state of Georgia, void . 6 Cranch 87.
3. The State of New-Jersey vs. Wilson, decided by the supreme court of the United -SLates, in 1812, declaring an act of assembly of the state of New-Jersey, void. 7 Cranch 164.
4. The case of Crittenden vs. Jones, decided by the supreme court of North-Carolina, in 1814, declaring an act of assembly of that state, giving a stay of execution after judgment, on entering into bond with security, void. 5'Hall’s Daw Journal 520.
5. Terrett, vs. I’aylor, decided in the supremo court of, the United States, in 1815, declaring two-acts of assembly of Virginia, void, so far as they impaired rights acquired under an executed contract. 9 Cranch 43.
■6. The ToVri of Pawlet vs. Clark, decided by the supreme court of the United Slates, at the same term, declaring void an act of assembly of the stale of Vermont. 9 Cranch 292.
7. Sturges vs. Crowninshield, in tho supremo Court of the United States, 1819, declaring an act of assembly of the gtate of New-York, void. 4 Wheat. 122.
8. M’Millan vs. M’Neill, decided by the same court, at the same-term, declaring an act of assembly, of the state of Louisiana, void, 4 Wheat 2C?.
9. Trustees of Dartmouth College vs. Woodwardj clecided by the same enure, at Ihe same term, declaring an act of ás'sémbly of tho state of Nevv-Hampshire, void, 4 Wheat, 518. ¿a vs.Bpiitb, ¡,'tfliy ,®be.I^i«3ajer%‘Míííephanica,-B.ank of-E©ÚnsykíMáa vs.S/nitb, ^Mjflédbs th4Su'ra®ríSe"@aurt''Mji)ie;XJniíed.lStaíésf,iirl821, déclar-, jíá^iSé/cfcrító ríf T^<a^«o-ír1«n*¥í^'^mf]> fi WViPíi t. 6 Wheat. ÍíST <A'???.*• ••. •• '* ■■ '' fg;áa%^'fe'ssd^V'@|fe'st«e cífBefansyim1wf$qíd> se<>’ •• «¡3r;-fTiP^ .• •- y11»* -t
*116The constitution of the United- States prohibits tho-states from makihg that a cr^e/^hich warsri'otamrime when the fact was committed, or making-it more penal; and from making that no contract, -which was a c¿n-tract when made; or-making the terms ofThe contract greater or smaller, or otherwise tháéi -stipulated by ttfe parties. Subject to these limitations and restrictions, the; states have a right to pass retrospective laws, á'tí-1 cor^$ng to their prudence and discretion.
That alterations in execution laws,' proc’esg,., and courts, do not impair the obligation of contracts.' \
A re-hearing'is most respectfully solicited. <£■
BIBB.
But, on the 4th of December, 1823, the petition was overruled.
Bjddle, supreme OOUlí.C'*' -IT.-i--- ,m*> ,T 1 •_ ...Si
fe'ty. Rfle<íir-HaYe'n,1 decided Ijy the supr.eipfe-cc>m\t.c># • tlxe , j¡b the:same.term, declaring void a;n;afit-,Qf,áss?}ublym moni. .8 Wheat. 464-ív • i'1. ' ’•

The case of Calder & ux vs. Bull and Wife, was this: On the 2‘lst March 1793, the court of probat for Hartford disapproved the will of Norinand Morrison, and refused to record it. More than 18 months elapsed after the rejection of the visj.31; so that, by the laws of Connecticut, all right of appeal was barred. Bull and wife, claiming under the will, and having no way, by the then existing laws of Connecticut, to get anew trial or re-hearing of the decision, petitioned the legislature" of Connecticutand-.thereupon, iñ May . 1795j the legislature passed a resolution,- or Ipy, setting aside the decree of the court of probat, of the 21st Marcn 1793, and granted a new hearing before the said court of probat,- with liberty of appeal therefrom in six morfths. A re-hearing was accordingly had, apd.the court of probat, in July 1795, approved the will. On appeal to the *90•superior court of Hartford, they affirmed the decree approving and recording the will. On appeal to the supreme court of errors of Connecticut, that qourt adjudged there were no errors. The case was then carried to the supreme court of the United States, by Calder and wife, who claimed the property in right of the wife, as heiress of N. Morrison. It was contended, that this lay of Connecticut was prohibited by the constitution of the United States; it wasceitainly a retrospective law; but the supreme court of the Union declared it no violation of tfyp constitution of the United States.

“ The insolventlaws of many, indeed-of by far the greater number of the states, discharge tile person of the debtor;'but leave his obligation to pay, in full force. To this the constitution is not opposed.” — Opinion continued, p. 203.

Counsellor Daggett, in his argument against the validity of the state law, in the case of Sturges vs. Crowninshield, 4 Wheat. 131, says, “ a'law declaring that debtors might bo discharged, on paying half the sum due, or that a creditor might recover double the sum due, ^re 3-like void.”

The act of assembly of Virginia, Session Acts, chap. 7, p. it, begins thus:
“Sec. 1. Whereas it is represented to the general assembly, that great injury has been sustained, both by the debtors creditors *114within this commonwealth, by the operation of the present laws concerning,executions: For remedy whereof,
“ Sec. 2. Be it enacted, &c. That so much of all and every act and acts of assembly, as empowers the sheriffs or other officer levying an execution on the goods or other estate of the debtor, to restore such goods or estate so taken, to the debtor, on his entering into bond with security, to páy the money or tobacco for which such execution was Koserved, and all costs, with lawful interest for the same, to such creditor, within three months, shall be, and the same is hereby repealed.
“ Sec. 3. And be it farther enacted, That on all executions hereafter issued,” &c. and provides for sales at (hree-fourths of the appraised value, or a replevin for twelve months; or if the debtor doe* not replevy, then for a sale at twelve months’ credit.

See Virginia Debates, p. 339, and 3 Dallas, Judge Gbase’s opinion , p. 391-3; Judge Patterson's opinion, p. «p inion, p. 399 and 400. 397 ; -J ud-ge Iredell’s